| | |
|---|---|
| Susan Guizan and Ronald Terebesi,<br>*Plaintiffs*,<br><br>v.<br><br>John F. Solomon, *et al.*,<br>*Defendants*. | Civil No. 3:09cv1436 (JBA)<br><br><br>September 30, 2010 |

## RULING ON MOTIONS TO DISMISS

Plaintiff Susan Guizan as administratrix of the Estate of Gonzalo Guizan has sued Defendants Town of Easton and its police Chief John F. Solomon, police Captain James, and police Officer Christopher Barton; the Town of Trumbull and its police Chief Thomas Kiely, police Lieutenant Ronald Kirby, police Sergeant Kenneth Jones, police Officers William Ruscoe, Brian Weir, Todd Edwards, and Gregg Lee; the Town of Monroe and its police Chief John Salvatore, police Sergeant Jay Torresso, and police Officer Michael Sweeney; the Town of Darien and its police Chief Duane Lovello and police Sergeant Mark Cirillo; the Town of Wilton and its police Chief Edward Kulhawik, police Sergeant Stephen Brennan, and police Officer Gregg Phillipson, under 42 U.S.C. § 1983 for violations of the Fourth (Count I) and Fourteenth (Count II) Amendments and under state law for battery (Count III), assault (Count IV), negligence (Count V), recklessness (Count VI), intentional infliction of emotional distress (Count IX), and aiding and abetting (Count X).  Guizan also sues the municipal defendants under Conn. Gen. Stat. § 52-557 (Count VII) and for indemnification of all sums their employees, agents, and/or officers have to pay, pursuant to Conn. Gen. Stat. § 7-465 (Count VIII).

In Ronald Terebesi's action, which has been consolidated with Guizan's, he sues the same Defendants under § 1983 for violations of the Fourth and Fourteenth Amendments (Counts One and Three), negligence (Count Four), and intentional infliction of emotional distress (Count Five). He sues Easton, Trumbull, Monroe, Darien, Wilton, and their respective police chiefs Solomon, Kiely, Salvatore, Lovello, and Kulhawik under § 1983, for failure to train members of the inter–town tactical team and failure to develop written policies governing the deployment of that team (Count Three). Finally, he brings *Monell* claims against the municipal defendants and seeks indemnification under Conn. Gen. Stat. §§ 52-557n and 7-465 (Count Six).

The Town of Darien, Chief Lovello, and Sergeant Mark Cirillo (the Darien Defendants) and the Town of Monroe, Chief Salvatore, and Sergeant Torresso (the Monroe Defendants) now move to dismiss both complaints against them.

I.      Factual Background Alleged

        A.      SWERT

The Southwest Regional Emergency Response team ("SWERT") is a specialized, tactical, "SWAT–type" unit formed by the Connecticut towns of Easton, Trumbull, Monroe, Darien, and Wilton through a mutual aid compact ("MAC") pursuant to Conn. Gen. Stat. § 7-277a. A 2005 MAC addendum provided that Solomon, Kiely, Salvatore, Lovello, and Kulhawik, in their roles as members of the Board of Police Chiefs ("BPC") "shall have administrative control of [SWERT]." (Guizan Am. Compl. [Doc. # 63] at ¶ 92.) Defendants Kirby, Jones, Ruscoe, Weir, Edwards, Lee, Torresso, Sweeney, Cirillo, Brennan, and Phillpson "were also members" of SWERT. (Terebesi Am. Compl. [Doc. # 60] at ¶ 13.)

The 2005 MAC addendum provided that chiefs Solomon, Kiely, Salvatore, Lovello, and Kulhawik "shall approve any and all Policies and Procedures concerning [SWERT]" and "shall designate and approve [SWERT] Team Commander[s]." (Guizan Am. Compl. at ¶¶ 93, 94.) Under the MAC, Defendant Towns of Easton, Trumbull, Monroe, Darien, and Wilton "delegate command and control of SWERT at any scene to the Team Commander." (*Id.* at ¶ 95.) Additionally, under the MAC, the participating towns delegate "'[o]verall command at any scene [to the] local jurisdiction' and the authorization to 'commence any operation' to the 'ranking local law enforcement officer at the scene.'" (*Id.* at ¶ 96 (quoting MAC).)

Plaintiffs allege that the Town of Easton, Solomon, Town of Trumbull, Kiely, Town of Monroe, Salvatore, Town of Darien, Lovello, Town of Wilton, Kulhawik, Kirby, Jones, Ruscoe, and Cirillo failed to adequately train and supervise members of SWERT on proper police practice and procedures, including knock–and–announce requirements for executing search warrants, proper use of distraction devices such as DefTech 25 explosives, and the use of firearms and deadly force, resulting in an unconstitutional use of excessive and fatal force in a no–knock house raid to execute a search warrant. (Terebesi Am. Compl. at ¶ 26; Guizan Am. Compl. at ¶ 98–101.)

B.     Background and Events of May 18, 2008

On April 18, 2008, two uniformed police officers from the Easton Police Department executed an arrest warrant for drug possession for Terebesi at his home. Terebesi cooperated with the police, accompanying them to the police station for processing without incident. The police released him without requiring any bond, on his promise to appear in court. On May 7, 2008, an unidentified individual discharged a shotgun into Terebesi's

home from outside, and a uniformed Easton police officer arrived and later reported that Terebesi cooperated fully with the investigation. That same day Defendant Officer Barton telephoned Terebesi, requesting that he come to the police station to give a statement, and Terebesi complied. On May 17, 2008, Barton called Terebesi again, to speak with him about a bag of hypodermic needles and other items found in Terebesi's neighborhood. Terebesi told Barton that while he had friends who would sometimes smoke marijuana in his house, he had no connection to those needles or other "hardcore drugs."

Gonzalo Guizan was an overnight visitor at Terebesi's home the night of May 17, 2008. At 9:00 a.m. on May 18, 2008, while Guizan was still at the Terebesi residence, the Easton police received a telephone call from a person, previously unknown to them, informing them that Terebesi and Guizan had taken something out of a small tin, placed it in two small glass pipes, and smoked it. She neither identified the unknown substance nor indicated that there were any weapons in the home.

By 9:15 a.m., before this informant provided a written statement, Defendants Solomon and Candee directed officers to dispatch SWERT to execute an anticipated search warrant as soon as possible. Solomon, Candee, and Barton then procured a warrant for the seizure of "2 small clear glass smoking pipes and crack cocaine in a tin box" (Guizan Am. Compl. at ¶ 42), which issued at 11:34 a.m.

Cirillo, Ruscoe, Jones, Kirby, Candee, and Solomon developed the "Operation Plan" for the SWERT assault on Terebesi's home to execute the warrant. It involved 21 armored, helmeted police officers in military attire, armed with semiautomatic and automatic weapons, sniper rifles, and explosives. When members of the SWERT team objected to the planned forcible entry into Terebesi's home, and proposed alternatives such as calling the

home and demanding that the occupants come out or sending uniformed officers to knock on the door, Ruscoe, Jones, Kirby, Candee, and Solomon overruled those objections and rejected their alternatives. Although SWERT standard operating procedures require negotiating before executing a tactical option, SWERT engaged in no negotiation, and the Operation Plan as developed did not include any negotiation.

The Operation Plan called for officers to break the rear windows of Terebesi's home before announcing their presence and deploy two DefTech25 explosive devices into the home. The Operation Plan also called for SWERT–team members to utilize a battering ram to break down the door and enter the home without announcing their presence—which would have permitted Guizan and Terebesi to open the door—and then to deploy an additional DefTech 25 explosive device into the room occupied by Terebesi and Guizan shortly before entering it. Terebesi alleged that the SWERT "police raid . . . occurred with the authorization, and under the direct supervision of the BPC, which included, *inter alia*, defendants Solomon, Kiely, Salvatore, Lovello and Kulhawik." (Terebesi Am. Compl. at ¶ 26.)

The SWERT–team raid was launched shortly after 2:00 p.m., while Terebesi and Guizan sat on Terebesi's family–room sofa watching television. Phillipson and Torreso shattered the dining room windows at the rear of the home with a gaff and halligan tool. Brennan then threw a "DefTech 25 explosive device into the home," and Torreso threw a second. (Guizan Am. Compl. at ¶¶ 67–68.) Simultaneous to the discharge of the explosives, which disoriented, deafened, stunned, and blinded Plaintiffs with smoke, one SWERT–team member announced the presence of police with a warrant. Edwards smashed open the outside door to the family room with a battering ram, and Lee threw an explosive into the

family room. Then, Sweeney, carrying a ballistic shield, wearing full ballistic body armor, a Kevlar helmet, and carrying a Glock semiautomatic pistol entered the family room, trailed by Weir. During all of this activity, Guizan and Terebesi, who were unarmed, made no attempts to resist or flee. A DefTech 25 explosive detonated in front of Sweeney, who then fired his handgun six times within three seconds, mortally wounding Guizan. Weir fired his M–4 assault rifle once. Torreso continued to search Terebesi's home, deploying at least eight more DefTech 25 explosives and starting a fire in the basement.

II.    Discussion

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Darien Defendants move to dismiss Plaintiffs' claims against Chief Lovello in his individual capacity. They also move to dismiss claims against Sergeant Cirillo on the basis of his qualified immunity. The Monroe Defendants move to dismiss all counts in the Guizan Amended Complaint. They also move to dismiss all counts in the Terebesi Amended Complaint pertaining to Monroe[1] except the Fourth Amendment excessive–force claims against Torreso in Count One  and the municipal liability claim against Monroe in Count Six to the extent that Terebesi seeks Monroe's indemnification for Torreso's liability under Count One.

---

[1] Monroe does not move to dismiss Count Two of the Terebesi Amended Complaint, which raises claims against Defendants Solomon, Candee, and Barton only.

Each individual Defendant also seeks dismissal on qualified immunity grounds.[2] Government officials are immune from liability for civil damages when their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The two–pronged qualified–immunity inquiry asks whether "the facts alleged show the officer's conduct violated a constitutional right," and if so, "whether the right was clearly established," such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) (citations omitted). The analysis may take place in any order "in light of the circumstances in the particular case at hand," *Pearson*, 129 S.Ct. at 818, so long as the immunity questions are resolved "at the earliest possible stage in litigation," *id.* at 815 (internal quotations omitted). Thus, qualified immunity protects a defendant if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly

---

[2] Although qualified immunity is an affirmative defense, "it may be asserted in a motion to dismiss under Rule 12(b)(6) of the Rules of Civil Procedure as long as the defense is based on facts appearing on the face of the complaint." *Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir. 2008) (internal citations omitted). When a party asserts qualified immunity in a motion to dismiss, "the defense faces a formidable hurdle" and "must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 434, 436 (2d Cir. 2004).

established constitutional right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citations omitted).

A.    Constitutional claims

1.    *Lovello and Salvatore*

Darien Chief Lovello and Monroe Chief Salvatore both move to dismiss Plaintiffs' individual capacity claims[3] against them in Counts One and Three of the Terebesi Amended Complaint and Counts I and II of the Guizan Amended Complaint.

i.    Personal involvement in the raid (Count One of the Terebesi Amended Complaint and Counts I and II of the Guizan Amended Complaint)

Plaintiffs allege that the actions of Lovello and Salvatore during the SWERT raid violated their Fourth and Fourteenth Amendment rights. Specifically, Terebesi alleges that as members of the BPC, Chiefs Lovello and Salvatore authorized and directly supervised the SWERT raid. Guizan alleges that SWERT was overseen by and under the control of Salvatore and Lovello, as members of the BPC, pursuant to the MAC and that the Operation Plan developed prior to the raid authorized an unwarranted amount of heavy force in light of the minimal threat Plaintiffs say they posed. Defendants contend that the claims against Lovello and Salvatore arising out of the actual raid must be dismissed, not because there were no allegations of constitutional violations before or during the raid, but because there is no allegation that either Lovello or Salvatore was personally involved in any unconstitutional conduct.

---

[3] Lovello maintains that policy, procedure, and training issues are "official capacity claims" only, which he does not move to dismiss. (Darien Mem. Supp. [Doc. # 70] at 4.) However, both complaints incorporate all facts for each count, and do not limit failure–to–train allegations against the supervisory officials to their official capacities only.

It is well settled within the Second Circuit that defendants' personal involvement in alleged constitutional deprivations is required under § 1983, *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010), and that the doctrine of respondeat superior alone "does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity," *Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003).

The personal involvement of a supervisory defendant may be shown by evidence of an official's

> (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

*Id.* From Plaintiffs' allegations that Lovello and Salvatore authorized the raid and directly supervised SWERT during it, it can be plausibly inferred that Lovello and Salvatore had notice of and acquiesced to the conduct authorized by the Operation Plan, despite objections by some SWERT team–members. Salvatore and Lovello's alleged knowing acquiescence to the use of excessive force in violation of the Fourth and Fourteenth amendments during the SWERT raid could give rise to their personal liability.[4]

---

[4] Unlike *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003), which dismissed claims of supervisory liability for remote supervising officers who allegedly directed a home raid during which excessive force was used because the plaintiffs had failed to allege "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Plaintiffs here allege that the Operation Plan called for the use of force excessive under the circumstances and that Salvatore and Lovello authorized and oversaw the raid that employed such force

ii.  Failure to train (Count Three of the Terebesi Amended Complaint and Counts I and II of the Guizan Amended Complaint)

Salvatore and Lovello also move to dismiss Plaintiffs' claims that they violated Plaintiffs' constitutional rights by failing to train SWERT team members adequately in proper police practice and procedures, "including the knock and announce requirement of search warrant execution, entry tactics, use of distraction devices, firearms training, disclosing information to the team, standard operating procedures, and the use of deadly force." (Guizan Am. Compl. at ¶ 98; *see also*, Terebesi Am. Compl. at ¶ 26.) Plaintiffs further allege that the raid was launched in the absence of any written policies governing the deployment of SWERT to execute search warrants and in the use of diversionary explosive devices, resulting in the use of excessive force during the raid. Those claims are properly analyzed under the Fourth Amendment and not the Fourteenth Amendment. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (noting that the district court had correctly classified plaintiff's failure–to–train claim "as one brought under the Fourth Amendment, which prohibits unreasonable seizures of persons, as opposed to the Fourteenth Amendment, which guarantees substantive due process" because the failure to train allegedly led to the use of excessive force).

As to Salvatore's argument that Plaintiffs' have failed to allege sufficient facts to make out a failure–to–train claim, the Supreme Court has explained that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to

deliberate indifference to the rights of persons with whom the police come into contact."

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).[5]

> To prove "deliberate indifference," plaintiffs must show
>
> (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights."

*Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009). "[A] policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).[6]

---

[5] In *Harris*, the Court provided as an example of deliberate indifference a municipality's failure to train police officers on the proper use of deadly force, where "city policymakers know to a moral certainty their police officers will be required to arrest fleeing felons" and that "[t]he city has armed its officers with firearms, in part to accomplish this task." *Id.* at 390 n.10. In such a situation, "the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious' that failure to do so would properly characterized as 'deliberate indifference' to constitutional rights." *Id.*

[6] *See also Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), in which the Second Circuit reversed dismissal of a failure–to–train and supervise claim brought against the City of New York by a plaintiff convicted of murder as a result of perjured testimony and the cover–up of exculpatory evidence, where the plaintiff alleged that the City failed to train and supervise police and prosecutors in 1971 on their obligations not to suppress or suborn perjury. The Second Circuit explained that a "complete failure" to train ADAs on their obligations to disclose exculpatory materials under *Brady v. Maryland*, 373 U.S. 83 (1963), could constitute deliberate indifference because "the district attorney knows to a moral certainty that ADAs will acquire *Brady* material," and because the court did "not think that in 1971, just seven years after *Brady* was decided, that the *Brady* standard was so obvious or easy to apply as to require, as a matter of law, no training or supervision," and a jury could have therefore concluded that the failure to train or supervise as alleged would likely result in ADAs making the wrong choices about disclosure of *Brady* material. *Walker*, 974 F.2d at 300.

While Plaintiffs do not actually allege that Salvatore and Lovello "knew to a moral certainty" that SWERT team members would be, or had previously been involved with house raids, deadly force, and employing explosive distraction devices, their allegations that Salvatore and Lovello oversaw and approved the policies and procedures of "a specialized, tactical, 'SWAT–type' unit" present sufficient plausibility that they knew that circumstances would arise at some point where SWERT members would be called on to launch a tactical raid and engage in forcible home entry involving the use of firearms and distraction devices.[7] And, as in the *Harris* hypothetical and *Walker*, it is reasonable to infer that the failure to train SWERT team–members on proper raid techniques creates a possibility that SWERT team–members could "mishandle" a situation in which they are required to use those techniques and tools, leading to the deprivation of constitutional rights. Therefore, since it is readily inferrable that SWERT team members were ready and armed to engage in home raids, which are high–risk operations, they would require a specific type of training, and the absence of adequate training for SWERT team members, for which Plaintiffs allege Salvatore and Lovello to be responsible, is actionable under the Fourth Amendment.

---

[7] Salvatore maintains that "[Guizan] has made no claim that the alleged training and supervision deficiencies she purports to identify were matters that ever presented to any municipal defendant a constitutional problem, before this incident" (Monroe Mem. Supp. Mot. Dismiss Guizan [Doc. # 73] at 14), implying that such a showing is required to sustain a claim of deliberate indifference. However, neither *Harris* nor *Walker* require showing that a constitutional violation has previously occurred for a policymaker to know to a moral certainty that a constitutional violation may occur in the future, necessitating training.

### iii.    Qualified Immunity

Salvatore[8] also contends that Plaintiffs' claims against him—that he knew about and acquiesced to the raid on Terebesi's home and that he failed to train or supervise SWERT team members—must be dismissed because he is entitled to qualified immunity.  As previously discussed, Plaintiffs have sufficiently alleged Salvatore's personal involvement, both in approving and supervising the raid and in failing to train and supervise SWERT, but Salvatore nonetheless argues that he is entitled to qualified immunity because in the exercise of his professional judgment, he reasonably could have been mistaken as to whether his conduct violated Plaintiffs' constitutional rights.

The Supreme Court explained in *Harris* that the need to train police in constitutional limitations on use of deadly force is "so obvious" that failure to do so constitutes deliberate indifference.  *Harris*, 489 U.S. at 390 n.10.  Inasmuch as the SWERT team is armed with lethal weapons and tasked with launching raids on homes, the law requiring proper training on the circumstances and method of their use given the potentially grave results to targeted persons is clearly established, and Salvatore's alleged failure to exercise professional judgment precludes qualified immunity for the failure–to–train claims at this stage.

As discussed above, Plaintiffs have adequately alleged Salvatore's personal involvement in the raid by the SWERT team in response to reports of a non–violent drug offense, where neither plaintiff posed a threat or had a violent history, and the weapons discharge outside Terebesi's home earlier in May 2008 did not give the police any reason to

---

[8] Although Lovello asserts qualified immunity as a ground for dismissal, his motion and briefing lay out no supporting argument, and counsel for Darien was absent at oral argument.  Therefore, the Court is unable to evaluate the merits of Lovello's claim of qualified immunity, and it will be denied.

believe either Plaintiff would resist arrest or evade arrest by flight, particularly since Terebesi had peacefully complied with all previous police requests. Given that the *Graham* test for excessive force is clearly established law, and Plaintiffs have alleged facts that, if proved, may constitute an objectively unreasonable use of force in deploying a SWERT team in an otherwise non–violent situation, Salvatore is not entitled to qualified immunity at this stage for his personal involvement in the SWERT team's raid.

### 2. Monroe Municipal Liability[9]

The Town of Monroe moves to dismiss Plaintiffs' Fourth and Fourteenth Amendment claims on the grounds that Plaintiffs insufficiently alleged deliberate indifference to support municipal liability under *Harris* or municipal liability for any Fourth Amendment violations during the raid itself. Municipal liability is limited to constitutional violations caused by an official policy or custom or final policymaker acting within his or her area of policymaking. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). This limitation serves "to distinguish acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell v. City of New York*, 436 U.S. 658 (1978)).

Plaintiffs allege that as a member of the BPC, and pursuant to the MAC, Salvatore was an official with final policymaking authority for the Town of Monroe on matters pertaining to SWERT. Since the specific exercise of Salvatore's policymaking authority alleged—failure to train and supervise SWERT and knowledge of and acquiescence to the raid on the Terebesi home—could give rise to constitutional violations, as discussed above,

---

[9] The Town of Darien does not move to dismiss claims against it.

Plaintiffs' allegations are sufficient to show Monroe's municipal liability for constitutional violations by its official policy under Salvatore to be plausibly feasible, and their claims against Monroe will not be dismissed.

### 3. Sergeant Torreso

Monroe Defendant Sergeant Torreso moves to dismiss Guizan's Fourth Amendment § 1983 claim against him on the basis that Guizan failed to plausibly allege that Torreso was a proximate cause of the death of Guizan's decedent, that he had any personal involvement in the initial decision to deploy SWERT or in the preparation of the Operation Plan, and that he had any realistic opportunity to intercede to prevent Sweeney from shooting Gonzalo Guizan. However, Guizan alleged that "[*a*]*ll* defendant members of SWERT . . . had an affirmative duty to intercede to stop the constitutional violations alleged herein" (Guizan Am. Compl. at ¶ 89 (emphasis added)), and specifically that Torreso had an opportunity to intercede, shattered the dining room window, and then threw a DefTech 25 explosive into the home that detonated in the dining room, just through an open doorway from Guizan and Terebesi. From these factual allegations, it can be reasonably inferred that he was part of the raid operation and near Gonzalo Guizan moments from when he was shot. At this stage, this is sufficient to support a claim of failure to intercede against Torreso.

Torreso also argues that Plaintiffs' Fourteenth Amendment claims against him should be dismissed, absent any allegations that he played any role pre–seizure activities and decision–making.[10] While Plaintiffs allege that Torreso participated in the raid itself, they

---

[10] Although the Fourth Amendment is the explicit source of constitutional protection in excessive force claims, the Fourteenth Amendment is applicable to claims against Torreso arising out of any pre–raid conduct.

do not allege that he was responsible for training SWERT–team members, developing departmental policies, or playing a role in the development of the Operation Plan, and there is therefore no factual allegation supporting the claim of Fourteenth Amendment liability. Plaintiffs' Fourteenth Amendment claims against Torreso will be dismissed.

Finally, Torreso maintains that he is entitled to qualified immunity because his personal conduct was objectively reasonable. However, Torreso is alleged to have been personally involved in what is plausibly described as an objectively unreasonable raid, given the minimal threat posed, the extreme force used, and the circumstances surrounding his no–knock entry. *See Richards v. Wisconsin*, 520 U.S. 385, 391–92 (1997) ("the fact that felony drug investigations may frequently present circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and announce in a particular case"). Therefore, he has not shown that he is entitled to qualified immunity at this stage.

### 4. *Sergeant Cirillo*[11]

Sergeant Cirillo also claims that qualified immunity protects him from suit both for his role in formulating the Operation Plan and in the raid itself. Plaintiffs alleged that Cirillo was one of six police officers who developed the "Operation Plan" for the SWERT assault and that he participated in the raid itself.

In arguing that the allegations show he did not violate Plaintiffs' Fourth Amendment rights,[12] Cirillo relies on *Gonzalez v. Reno*, in which plaintiff homeowners' claims against the

---

[11] Qualified immunity is the only basis for Cirillo's motion to dismiss.

[12] Cirillo does not address Plaintiffs' Fourteenth Amendment claims, and in the absence of any argument supporting dismissal of those claims, they will remain.

Attorney General, the Commissioner of the INS, the Deputy Attorney General, and an INS Agent, were dismissed on grounds of qualified immunity because the plaintiffs failed to allege facts to support a causal connection between those defendants' conduct and any constitutional violations that occurred during the raid looking for Elian Gonzalez. 325 F.3d 1228, 1235–36 (11th Cir. 2003).

In marked contrast, Cirillo is alleged to have not only participated in the raid, but to have developed the Operation Plan, whose execution involved excessive force and disregard of the knock–and–announce rule, in violation of clearly established law.[13] *See Graham*, 490 U.S. at 396. Therefore, at this stage, Plaintiffs' claims against Cirillo for both planning and participating in the raid are not barred by the qualified immunity doctrine.

B.     State law claims[14]

The Monroe Defendants move to dismiss state law claims of assault and battery, negligence, recklessness, and intentional infliction of emotional distress, arguing that Plaintiffs have failed to allege specific facts that would implicate Torreso and Salvatore in any tortious conduct. Plaintiffs respond that even though they have not alleged that Torreso and Salvatore personally committed all of the tortious conduct, that conduct can be imputed to

---

[13] While *Richards* recognized that drug investigations frequently pose special risks to officer safety, it explained that the clearly established knock–and–announce rule may only be lawfully abandoned when police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." 520 U.S. at 393–94. Plaintiffs are entitled to discovery on Cirillo's assertion that as a result of the existence of this exception, he did not knowingly violate this clearly established law when he stormed the house.

[14] The Darien Defendants do not move to dismiss state–law claims.

Torreso and Salvatore through theories of acting–in–concert and supervisory liability respectively.

First, Plaintiffs assert that Torreso is jointly liable as a team member for actions taken by others in the coordinated, planned operation. To determine whether a defendant is subject to tort liability for harm to a third person resulting from the tortious conduct of another, Connecticut looks to factors set forth in the Restatement (Second) of Torts:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

*Rangel v. Parkhurst*, 64 Conn. App. 372, 382 & n.7 (2001) (quoting Restatement (Second) Torts § 876 (1979)). The rules regarding joint tortfeasons are applicable "to all torts, including not only negligence but also . . . any other basis of tort liability." *Gionfriddo v. Gartenhaus Café*, 15 Conn. App. 392, 398 (1988). Therefore, tortious actions taken by one SWERT team–member as part of the raid may be imputable to the other SWERT–team members who participated in the raid, including Torreso. Similarly, because Salvatore allegedly authorized and supervised the raid, it can be plausibly inferred that he provided "substantial assistance or encouragement" to members of the SWERT team, such that SWERT conduct during the raid may be imputed to him.[15]

---

[15] Guizan also asserts Salvatore's liability for tortious conduct of officers acting under his supervision, under Section 358(2) of the Restatement (First) of Agency, which provides that

> [a]n agent employing servants or other agents, not revealing to them the

1.      *Intentional Torts*

i.      Assault and Battery

The Monroe Defendants move to dismiss Guizan's[16] battery claim (Count III) and assault claim (Count IV), claiming that there are no allegations that Torreso had any direct verbal relations or physical interaction with the decedent or that any alleged conduct attributed to him was *unlawfully* performed with an intent to cause an imminent apprehension of harmful or offensive bodily contact; that Salvatore was not personally involved in the raid; and that the town of Monroe cannot be liable for the intentional torts of its employees, pursuant to Conn. Gen. Stat. § 52-557n.

Because the actions of any SWERT–team member acting in concert with Torreso and Salvatore may be imputed to them, *see Rangel*, 64 Conn. App. at 382 & n.7, and the unlawfulness of the SWERT–team members' conduct has been alleged, Guizan has sufficiently alleged assault and battery as to Torreso and Salvatore. However, the Town of Monroe is correct that "a municipality cannot be liable for the intentional conduct of its employees under Conn. Gen. Stat. § 52-557." *Nanos v. City of Stamford*, 609 F. Supp. 2d 260,

---

existence of the principal, is subject to liability to third persons for their torts as is any other principal; if he reveals the existence of the principal to them, but not to third persons, he is subject to liability for their torts only to persons who have dealt with such agents in reliance upon their apparent employment.

However, Guizan fails to explain how that agent–liability principle applies to Salvatore in his capacity as a member of the BPC. Guizan obviously does not allege that the existence of the principal—Town of Monroe and the BPC—was hidden from SWERT team–members or Plaintiffs, a necessary condition imputing liability to an agent (Salvatore) for a sub–agent's (SWERT's) conduct.

[16] Terebesi does not allege assault and battery.

267 (2009) (citing *Pane v. City of Danbury*, 267 Conn. 669, 685–86 (2004), *overruled on other grounds by Grady v. Town of Somers*, 294 Conn. 324 (2009)). Guizan's assault and battery claims against the Town of Monroe based on the alleged intentional conduct of Monroe agents will therefore be dismissed.

ii.      Intentional Infliction of Emotional Distress

Monroe Defendants move to dismiss Counts IX of Guizan's Amended Complaint and Five of Terebesi's Complaint, which allege intentional infliction of emotional distress ("IIED"). As discussed *supra*, the Town of Monroe cannot be held liable for the intentional torts of SWERT–team members, and in the absence of any allegations of IIED specifically directed to the municipality, Plaintiffs' IIED claims against it will be dismissed. However, because the alleged tortious conduct of any SWERT–team member, including Sweeney and Weir, can give rise to imputed liability for Torreso and Salvatore if they acted in concert with them during the raid or provided substantial assistance, and given that the Monroe Defendants do not challenge the sufficiency of facts alleged to support an IIED claim against Sweeney and Weir, the IIED claims against Torreso and Salvatore will not be dismissed.

iii.      Aiding and abetting

Monroe Defendants move to dismiss Guizan's Count X, which is a claim against all Defendants for "aiding and abetting," because "these defendants neither engaged in nor contributed to any 'wrongful acts.'" (Monroe Mem. Supp. Dismiss Guizan at 38.) Based on the Restatement (Second) of Torts § 876, Connecticut courts have held that the elements of a civil aiding and abetting claim include that

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the

20

assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Efthimiou v. Smith*, 268 Conn. 499, 505 (2004). Guizan simply argues that "[t]he Amended Complaint sets forth these elements." Plaintiffs have sufficiently alleged the first element, that members of the SWERT team acted to cause harmful contact with Plaintiffs by throwing explosives into the Terebesi home and shooting at Guizan, and that contact did in fact occur. Additionally, Guizan alleges that both Torreso and Salvatore knowingly and substantially participated in or assisted the raid. Torreso allegedly threw one of distraction devices that immediately preceded the SWERT entrance into Terebesi home, and was "generally aware" of his role as part of the team that committed assault and battery, while Salvatore authorized and supervised the raid. However, because civil aiding and abetting is an intentional tort, and the Town of Monroe is not liable for the intentional acts of its employees, it cannot be liable for aiding and abetting.

### 2.    *Negligence*

Monroe Defendants next argue that Plaintiffs' negligence allegations against Salvatore, Torreso, and the Town of Monroe are inadequate as a matter of law. Their first contention—that Plaintiffs cannot allege both intentional torts and negligence in the alternative—is incorrect under Connecticut law. Their reliance on *Betancourt v. Slavin*, 676 F. Supp. 2d 71 (D. Conn 2009), is misplaced for two reasons: first, *Betancourt* was decided on summary judgment with a more fully–developed factual record, and second, its determination was based on New York law, under which "'once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently." *Vilkuhu v. City of New York*, No.

06cv2095 (CPS) (JO), 2008 WL 1991099, *9 (E.D.N.Y. May 5, 2008) (quoting *Oliver v. Cuttler*, 968 F. Supp. 83, 92 (E.D.N.Y. 1997)).   In contrast, under Connecticut law, "a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint." *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 101 (D. Conn. 2000); *see also Dreier v. Upjohn Co.*, 196 Conn. 242, 245 (1985); *accord Hanover Ins. Co. v. Fireman's Fund Ins. Co.*, 217 Conn. 340, 346 (1991) (absent a showing of prejudice, inconsistent pleadings are not prohibited).

The Monroe Defendants alternatively argue that governmental discretionary–act immunity under Connecticut law bars Plaintiffs' negligence claim here.[17]   Under Connecticut law, municipal employees are immune from liability for performance of their discretionary acts, and police department operations constitute a governmental function such that "acts or omissions in connection therewith ordinarily do not give rise to liability." *Gordon v. Bridgeport Hous. Auth.*, 208 Conn. 161, 179–80 (1988).   However, this immunity is not absolute:

> Connecticut recognizes three exceptions to a municipal employee's discretionary act immunity: (1) "where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to an imminent harm" . . . ; (2) "where a statute specifically provides for a cause of action against a municipality or municipal official for failing to enforce certain laws;" and (3) "where the alleged acts involve malice, wantonness, or intent to injure, rather than negligence."

*Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 672 (D. Conn. 2008) (citing *Purzycki v. Town of Fairfield*, 244 Conn. 101, 108 (1998)).

---

[17] Governmental discretionary–act immunity is generally available to both the municipal employee and the municipality itself in a negligence action. *Gordon v. Bridgeport Hous. Auth.*, 208 Conn. 161, 165–66 (1988).

Guizan alleges that the decedent was "part of a narrowly defined class of foreseeable victims subject to imminent harm," and "defendants were public officials to whom it was apparent that their conduct was likely to lead to such harm." (Guizan Am. Compl. at ¶¶ 126, 127.) Salvatore argues that the imminent harm exception is inapplicable to him since the specific allegations against him relate to the overall administration of the police department, the establishment of policies and procedures, and implementation of training regimens, which "manifestly occurred prior to and wholly apart from the subject operation, at a point in time when there existed neither an identifiable victim nor an imminent harm." (Monroe Mem. Supp. Dismiss Guizan [Doc. # 73] at 31.) Torreso maintains that he is immune because Plaintiffs have failed to allege the direct application of physical force by Torreso against them, resulting in harm. (*Id.* at 32–33.)

In determining whether the "imminent harm exception" applies, Connecticut courts consider three factors: whether there is (1) an immediate harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. *Fleming v. City of Bridgeport*, 284 Conn. 502, 533 (2007). Those "'core requirements of the imminent harm exception are analyzed conjunctively,' so that to prevail, a plaintiff must demonstrate all three elements." *Seri*, 573 F. Supp. 2d at 672 (quoting *Doe v. Petersen*, 279 Conn. 607, 616 (2006)). In *Sestito v. Groton*, 178 Conn. 520, 521 (1979), the plaintiff sought damages on behalf of a decedent who was fatally wounded in a shooting that was witnessed by the defendant police officer. The officer, seeing a small crowd of men shoving each other in a parking lot could have easily intervened but did not until he heard gunshots and called the police station, by which time the decedent had been fatally wounded. The Connecticut Supreme Court concluded that there was sufficient

evidence on which a jury could determine that the officer should have known there was an immediate harm and an identifiable victim, and that it was apparent that his failure to intervene would breach a duty to the decedent. In contrast, in *Seri*, the plaintiff who claimed he was wrongly convicted of public indecency because the Town of Newtown failed to train defendant police officers in a variety of areas, including "the common characteristics of a sexual offender, the importance of fingerprint information, . . . finding probable cause to arrest, the effectuation of arrests, and general conduct as arresting police officers,'" could not demonstrate that the plaintiff was specifically identifiable or that it was apparent he faced imminent harm, because while failures alleged were "likely to eventually result in *some* harm to *some* person," it did not necessarily mean "that [Seri] would be the victim of the Newtown police department's inadequate training or supervision, nor that the result of such negligence would be the false arrest and prosecution of an innocent person accused for indecent exposure at the public library, i.e., the specific harm that occurred in this case." 573 F. Supp. 2d at 674–75 (emphasis in original).

Plaintiffs have alleged sufficiently specific facts as to negligence by Salvatore and Torreso, showing they are not protected by governmental, discretionary–act immunity at this stage. Terebesi alleges that the raid in which Torreso participated occurred "with the authorization, and under the direct supervision, of members of the BPC" including Salvatore. (Terebesi Am. Compl. at ¶ 26.) Because Plaintiffs were the subjects of the raid, they were specifically identifiable and known to be subject to imminent harm by participants in the raid. Plaintiffs' allegations against Salvatore and Torreso are more akin to those in *Sestito*, in which the police–officer defendant knew that specific individuals were at physical risk yet took no action until after the plaintiff had been shot. Salvatore allegedly authorized

24

the deployment of SWERT and supervised its operation, which targeted identifiable individuals for potential use of force, and Torreso allegedly knew that these Plaintiffs as occupants faced imminent harm and contributed to that harm by storming the house and throwing a DefTech 25 explosive into the Terebesi residence. Therefore, neither Salvatore nor Torreso has shown his immunity to negligence liability at this stage.

Because the negligence claims against Salvatore and Torreso will survive Monroe's motion to dismiss, so too will Plaintiffs' negligence claims against the municipality. Conn. Gen. Stat. § 52-557n(a)(1) provides that "a political subdivision of the state shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties." While Conn. Gen. Stat. § 52-557n(a)(2)(B) precludes municipal liability when negligent acts or omissions by municipal employees "require the exercise of judgment or discretion," the "identifiable person, imminent harm exception to employees' [discretionary–act] immunity applies to the immunity afforded to municipalities for the negligent performance of discretionary acts under § 52-557(a)(2)(B)." *Grady*, 294 Conn. at 348–49. Torreso and Salvatore both carried out official duties during the raid, and at this stage, the identifiable person, imminent harm exception to discretionary–act immunity applies to the conduct of those individual defendants during the raid, so the facts alleged can give rise to Monroe's negligence liability.

3.       *Recklessness*

Monroe Defendants next argue that Guizan's recklessness claim in Count VI must be dismissed[18] because the only allegation of recklessness against Torreso is that the Defendants "smashed windows and threw in explosive devices before announcing their presence," which Torreso says fails to establish a basis of his liability to Guizan.

It is undisputed that Plaintiffs have alleged facts that might plausibly suggest such highly unreasonable conduct as to certain members of the SWERT team, and because Torreso acted in concert with them, and Salvatore provided them with substantial assistance, their alleged recklessness could be imputed to them. *See Rangel*, 64 Conn. App. at 382 & n.7. However, the Connecticut Supreme Court in *Elliott v. City of Waterbury*, 245 Conn. 385, 415 (1998) explained that "at least in the context of common–law tort actions," the concepts of "wanton and reckless conduct, on the one hand, and wilful, intentional and malicious conduct on the other" are "indistinguishable."  Thus, under Conn. Gen. Stat. § 52-557n,

---

[18]       In order to establish that the defendants' conduct was reckless, the plaintiff must prove, on the part of the defendants,

> the existence of a state of consciousness with reference to the consequences of one's acts . . .  [Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . .  It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . .  [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.

*Shay v. Rossi*, 253 Conn. 134, 181 (2000), *overruled on other ground by Miller v. Egan*, 265 Conn. 301 (2003).

which precludes municipal liability for the "wilful misconduct" of municipal employees, Monroe cannot be liable for the reckless acts of its employees.

III.     Conclusion

Accordingly, Darien Defendants' [Doc. # 70] Motion to Dismiss is DENIED. Monroe Defendants' [Doc. # 78] Motion to Dismiss Guizan's Amended Complaint is GRANTED in part and DENIED in part.  It is granted insofar as it seeks to dismiss Counts III, IV, VI, IX, and X of the Guizan Amended Complaint against the Town of Monroe, and Count II of the Guizan Amended Complaint against Torreso.  It is denied to the extent it seeks to dismiss any Counts against Salvatore; Counts I, III, IV, V, VI, IX, and X as to Torreso; and Counts I, II, and V against the Town of Monroe.  Monroe Defendants' [Doc. # 78] Motion to Dismiss Terebesi's Complaint is GRANTED in part and DENIED in part.  It is granted insofar as it seeks to dismiss Count Five as to the Town of Monroe and the Fourteenth Amendment claims in Count One against Torreso.  It is denied insofar as it seeks to dismiss any Counts against Salvatore; Counts One, Three, and Four against the Town of Monroe, and Counts  Three, Four, Five, and the Fourth Amendment Allegations in Count One against Torreso.

IT IS SO ORDERED.


/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September, 2010.