UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Susana Guizan, Administrator of the Estate of Gonzalo Guizan, & Ronald Terebesi, *Plaintiffs*  v.  Town of Easton, et al., *Defendants.* | Civil No. 3:09cv1436 (JBA)  August 29, 2012 |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

Defendants Town of Easton, Chief Solomon, Captain Candee, Officer Barton, Town of Trumbull, Chief Kiely, Lieutenant Kirby, Sergeant Jones, Officer Ruscoe, Officer Weir, Officer Edwards, Officer Lee, Town of Monroe, Chief Salvatore, Sergeant Torreso, Officer Sweeney, Town of Darien, Chief Lovello, and Sergeant Cirillo ("Defendants") collectively move [Doc. # 199] for summary judgment, arguing that the undisputed facts and the doctrine of qualified immunity render all of Plaintiffs' claims unsustainable. Defendants Town of Wilton, Wilton Chief of Police Kulhawik, Sergeant Brennan, and Officer Phillipson move separately [Doc. # 200] for summary judgment. For the reasons that follow, Defendants' motions [Doc. ## 199, 200] will be granted in part and denied in part.

I.     Factual Background

As of May 18, 2008, the Southwest Regional Emergency Response Team ("SWERT") was a specialized police tactical unit formed through a Mutual Aid Compact ("MAC") pursuant to Connecticut General Statutes § 7-277a. The MAC was formed among the towns of Easton, Trumbull, Monroe, Darien, Wilton, and Westport. (*See* Mutual Aid Compact, Ex. A to Def.'s Loc. R. 56(a)1 Stmt.) SWERT was formed for the purpose of providing for the

"rapid and/or previously planned deployment of specially trained law enforcement personnel and resources to any incident involving tactical operations, manmade or natural disaster, search and rescue, . . . or any situation requiring immediate augmentation of local law enforcement personnel to preserve life and protect property." (*Id.*) The Board of Police Chiefs ("BPC") was the administrative governing body of SWERT and was comprised of the Defendant chiefs of the police departments from Easton, Trumbull, Monroe, Darien, Wilton, and Westport. (*Id.* ¶ 2.)

Pursuant to the MAC, the BPC "shall have administrative control of [SWERT]," and the BPC "shall approve any and all Policies and Procedures concerning [SWERT]." (*See id.*) The BPC is also charged with designating and approving all SWERT team commanders. (*Id.*) Trumbull Lieutenant Kirby was the SWERT Commander, Trumbull Sergeant Jones was the Assistant SWERT Commander, Trumbull Officer Ruscoe was a Team Leader, and Darien Sergeant Cirillo was a Team Leader. (*See* Kirby Dep., Ex. N to Def.'s 56(a)1 Stmt at 22–23; Ruscoe Dep., Ex. W to *id.* at 11–13; Jones Dep., Ex. X at 9; Cirillo Dep., Ex. O at 9–10; 18–19.)

A.      Interactions with Plaintiff Ronald Terebesi prior to May 18, 2008

On March 31, 2008, around 2:00AM, Officer Barton of the Easton Police Department was dispatched to 91 Dogwood Drive, the residence of Plaintiff Terebesi, in response to a 911 call reporting that a man was having a seizure. (Barton Dep., Ex. B to Def.'s 56(a)1 Stmt at 17.)  The responding officers found the door unlocked, and could see Terebesi from the outside window. (*Id.* at 18–19.) After knocking several times, they went in and shook Mr. Terebesi awake. While in Mr. Terebesi's home, the officers noticed a loaded .357 Magnum handgun on the sofa with Mr. Terebesi (*see* Terebesi Dep., Ex. D to Def.'s 56(a)1 Stmt at 54),

and EMS personnel found glass–stem crack pipes next to Terebesi on the couch (*see id.* at 187–88).

As a result of the March 31 incident, Mr. Terebesi was arrested for possession of drug paraphernalia on April 12, 2008, based on the arrest warrant executed by Officers Festa and Barton of the Easton Police Department. (Terebesi Dep. at 379.) Mr. Terebesi got ready to go to police headquarters, and asked Officer Barton how long he would be gone (Terebesi Aff., Ex. 1 to Terebesi's Loc. R. 56(a)2 Stmt ¶ 16), because he loved his pet macaw very much, and was worried about leaving the bird unattended for too long. (*Id.*; *see also* Barton Dep., Ex. B to Def.'s 56(a)1 Stmt at 142–44.) At the conclusion of Mr. Terebesi's booking, he was released on a promise to appear, and given a ride home by the officers. (Terebesi Dep. at 380.)

On May 7, 2008, around 4:00AM, Mr. Terebesi's residence was attacked by an unidentified person who repeatedly discharged a shotgun through the windows from outside. (*See id.* at 171–72.) Mr. Terebesi had been sitting on his couch watching television. (Terebesi Aff. ¶ 21–22.) A neighbor called 911 and Officer David Simpson of the Easton Police Department responded to the call. (Affidavit of Officer Simpson, Ex. F to Def.'s 56(a)1 Stmt ¶ 4.) Chief Solomon interviewed Mr. Terebesi after the shooting (*see* Solomon Dep., Ex. G to Def.'s 56(a)1 Stmt at 168–69), and Officer Barton went to Mr. Terebesi's house to discuss Mr. Terebesi giving a statement about the shotgun attack. Both Chief Solomon and Officer Barton testified at their depositions that they found Terebesi's responses to be evasive and untruthful. (*See id.*; Barton Dep. at 178–79, 190.) Later on May 7, Terebesi went to the station and gave a statement.

In the weeks before the shotgun attack on Mr. Terebesi's residence, the Easton Police Department had heard from Ms. Joanne Chmurra, Ms. Tina Lamica, and a neighbor, about Mr. Terebesi's drug use. (*See* Def.'s 56(a)1 Stmt ¶¶ 41, 43, 44.) On May 17, 2008, a neighbor, Ms. Alison Kovacs, whose husband was a police officer, complained to the Easton Police Department (*see* Deposition of Captain Candee, Ex. J to Def.'s 56(a)1 Stmt at 174), about finding hypodermic needles in the neighborhood near Terebesi's house, and told Officer Barton that she had observed "a steady flow" of odd–hours traffic in and out of the Terebesi house (*see* Barton Dep. at 65–66). On May 17, 2008, Officer Barton went to speak with Mr. Terebesi, but noticed that the house seemed "fortified," which he concluded was a reaction to the May 7, 2008 attack. (*See* Barton Dep. at 72–73.) He did not feel comfortable being alone there, so he telephoned Mr. Terebesi from the Police Department (*see id.* at 67:7–12). Mr. Terebesi denied any knowledge of the drug paraphernalia found in the neighborhood, and told Officer Barton that it would not have belonged to his friends, as his friends "were more of a marijuana crowd or group." (*Id.* at 68:15–16.) Officer Barton testified that he had never concluded that Mr. Terebesi used intravenous drugs. (*Id.* at 68:17–20.)

B.      Events of May 18, 2008

On May 18, 2008, around 9:00 a.m., a woman named Chandra Pankov came to the Easton Police Department and reported that she had personally witnessed drug activity in a house within the preceding hours, and as she described the layout of the interior of the house, Officer Barton recognized that she was describing Mr. Terebesi's residence. (*See* Barton Dep. 189:10–15.) She could only identify the address as "41 something–Wood," but she identified a person present there as "Ron." (*See id.* at 98.) Plaintiff Terebesi confirmed that Ms. Pankov had been at Mr. Terebesi's residence earlier that morning, as a friend of

decedent Gonzalo Guizan, and Mr. Terebesi recalls that she "reeked of alcohol, she talked a lot and twitched, as if she might be high on narcotics," and was dressed "loudly and provocatively." (Terebesi Aff. ¶ 40.) Mr. Terebesi told Guizan that Ms. Pankov would have to leave. (*Id.* ¶ 41.) Ms. Pankov was angry when Mr. Guizan asked her to leave, and she told both Guizan and Terebesi to "go f___ themselves" before she got in her car and drove away. (*Id.* ¶ 42.)

Officer Barton understood the drugs that Ms. Pankov had seen to be a small quantity. (*See* Barton Dep. at 117.) After speaking with Ms. Pankov, Officer Barton notified Chief Solomon, who directed him to begin working on a search warrant application, and wanted it "done that day." (*Id.* at 89:10–17.) Officer Barton and Chief Solomon both noticed Ms. Pankov's clothing and her "rotted teeth," and thought that she may have been a prostitute (*see* Solomon Dep. at 618–19), but did not question her credibility (*id; see also* Barton Dep. at 180–81).

Captain Candee spoke with Chief Solomon at 9:24 that morning, and by then, Chief Solomon had already requested the services of SWERT to assist with the warrant execution. The warrant application requested "that a search warrant be issued for 91 Dogwood Drive Easton, CT to search for cocaine and 2 glass smoking pipes." (Search Warrant Application, Ex. 15 to Guizan's Loc. R. 56(a)2 Stmt at 3.) The warrant application did not describe Ms. Pankov in any detail, and specified only that she had come in to the police station to make a complaint about drug use. (*See* Search Warrant Application at 3.) A search warrant for Terebesi's residence was issued on May 18 at 11:34 a.m..

### 1. *Other Police Chiefs Are Notified*

On May 18, 2008, Chief Duane Lovello, the police chief for Darien, was informed by his captain that SWERT was being activated at the request of the Easton Police Department for a warrant service. (Deposition of Chief Lovello, Ex. K to Def.'s 56(a)1 Stmt at 46.) Chief Lovello learned only that there was a potential weapon involved, and he spoke with no one else about the warrant service prior to it occurring. (*Id.*) Monroe Chief John Salvatore learned of the SWERT callout when he received a phone call from Trumbull Chief Kiely. (Deposition of Chief Salvatore, Ex. L to Def.'s 56(a)1 Stmt at 41.) Chief Salvatore was informed that the Easton police were preparing a search and seizure warrant to be executed at a residence where there was suspected drug activity and a possible gun. (*Id.*) Chief Kiely had received a phone call from Lieutenant Ronald Kirby notifying him that SWERT was being activated, what the warrant involved, and that there had been a shooting at the residence in question. (*See* Deposition of Chief Kiely, Ex. M to Def.'s 56(a)1 Stmt at 11.) Wilton Chief Edward Kulhawik was advised that Chief Solomon had activated SWERT for execution of the search warrant, but knew only that the search warrant was for narcotics, and was believed to be "high risk." (Kulhawik Aff., Ex. 8 to *id.* ¶¶ 5–7.)

### 2. *SWERT Briefing*

The members of the team who were available assembled in the East Emergency Medical Services building for a briefing. (Deposition of Ronald Kirby, Ex. N to Def.'s 56(a)1 Stmt at 101–102, 122–24.) Chief Solomon told the team that Tina Lamica had provided Easton Police with information about Terebesi's habitual use of crack cocaine. (Solomon Dep. at 518.) Solomon also noted that a suspect from the May 7 shotgun attack may have

been connected to an exotic dancer who was at the Terebesi residence that night, and that the suspect had a criminal history. (*Id.* at 520–21.)

The operational plan implemented was developed by Officer Ruscoe and Sergeant Jones of the Trumbull Police Department, and Sergeant Cirillio of the Darien Police Department. After review, the plan was approved by Lieutenant Kirby of Trumbull, who was also the Commander of the SWERT team. (Written Statements of Ruscoe, Jones, Cirillo, and Kirby, Exs. S, T, U, V to Def.'s 56(a)1 Stmt.) The plan was subject to the ultimate approval of Chief Solomon, the highest ranking official of the requesting agency. (*See* MAC ¶ 10.) Captain Candee of the Easton Police Department understood that the SWERT operation plan called for a "Rake and Break" team to approach the house, break windows and deploy flashbangs at the rear. (Candee Dep. at 136.) The team also planned to knock at the front door and announce its presence, and then "take the door down." (*Id.* at 136.) At the briefing, Captain Candee questioned the planned use of flashbangs, and Lieutenant Kirby responded that he felt that it was necessary for the safety of his officers. (*Id.* at 173.) Candee deferred to Kirby in this regard. (*Id.*)

In developing the operational plan, Sergeant Cirillo testified that it was "very important" to him that the Easton police had described Terebesi's residence as having been "fortified" after the shotgun attack (Cirillo Dep. at 123), and that if the Easton police had instead just described it as "someone covering a broken window with plywood . . . just to cover a broken window" (*id.*), it would have meant something else to him. The team members asked Barton for some general background information about Terebesi and his house, and Officer Barton testified that he told the officers that there was a Beretta handgun that "was unaccounted for," which Barton had learned about on April 12 when he and

7

Terebesi engaged in a "cordial" conversation, during which Terebesi mentioned that he had a collectors' edition Beretta that he kept at his parents' house in a display case." (Barton Dep., Ex. 1 to Pl.'s 56(a)2 Stmt at 33.) The officers responsible for creating the plan were also provided information by the Easton Police Department that Mr. Terebesi had made "bizarre statements" suggesting he would use force to protect his pet macaw, or "defend his bird to the death." Plaintiffs dispute this, as does Officer Barton, who testified at his deposition that during the April 12 arrest warrant service, Barton had asked Terebesi about the bird, and Terebesi has responded to the effect of, "that bird's my life. I would do anything that I needed to do to protect that bird." (Barton Dep. 143:9–11.) Officer Barton also testified that "[he] didn't say to them that [Terebesi] would fight to the death or . . . would attack an intruder over the well–being of [the] bird." (*Id.* 144:12–14.)

Redgate and Lawlor, two snipers who were part of the SWERT team who did not participate in the raid, each had approximately twenty–five years of experience (Redgate Dep., Ex. 8 to Pl.'s 56(a)(2) Stmt at 7, 9; Lawlor Dep., Ex. 9 to *id.* at 7), and disagreed with the plan as it was described to them. Both Redgate and Lawlor proposed alternate plans that they believed to be safer for the occupants and the officers, but these plans were rejected. Lawlor testified that he told Cirillo that a dynamic entry was "too dangerous for a drug warrant." (Cirillo Dep., Ex. 17 at 146.) Until then, SWERT had never been activated to seize personal use amounts of drugs. (Kiely Dep., Ex. 34 to Pl.'s 56(a)2 Stmt at 23.)

### 3.   *Implementation of Operational Plan*

Around 2:00 p.m. on May 18, 2008 Sergeant Torreso (Monroe) and Officer Phillipson and Lieutenant Brennan (Wilton) were deployed to the rear of the Terebesi residence as the "Rake and Break" team. In accordance with the plan, these officers broke

a rear window with a tool, and then deployed their distraction devices. Brennan announced the police presence, though Plaintiffs dispute that this announcement was made *before* the explosion of the first flashbang. Brennan also announced, "police, police with a warrant. Hands up," as the entry team was approaching to knock on the door. (Deposition of Lieutenant Brennan, Ex. Z to Def.'s 56(a)1 Stmt at 91–92.)

During this time, the entry team members moved to the front door and began announcing their presence. Plaintiffs deny that the entry team acted in the manner Defendants described, showing in a demonstrative chart of the report based on the video tape of the SWERT raid that the entry team knocked and announced between the second and third flashbang, an interval of 7.194 seconds, and that the third flashbang was thrown 1.5 seconds before it detonated. (Ex. 37 to Pl.'s 56(a)2 Stmt.) Thus, the Plaintiffs' record shows that the team had 5.694 seconds to open the screen door, check the inside door, knock on the door, announce themselves, breach the door, look in the room, and then deploy the third flashbang. (*See* Deposition of Officer Edwards, Ex. 30 to *id.* 39–47; Deposition of Officer Lee, Ex. 31 to *id.* 91–98; Deposition of Officer Weir, Ex. 16 to *id.* at 124–25.) Although disputed by Plaintiffs, Defendants state that they waited "several seconds" for the occupants to respond to the knock and announcement. Officer Sweeney testified at his deposition that SWERT was trained that as soon as you have "knocked three times and announced," you can enter the home, and that there is no period of time that you have to wait. (*See* Deposition of Officer Sweeney, Ex. 26 to *id.* at 86:1–15.) Officer Edwards is the "primary breacher" on SWERT, and his understanding of the knock and announce requirement was that unless you hear something inside, you wait "a couple seconds" and then breach the door with the battering ram. (Edwards Dep. at 33.) He also testified that *only*

if he had heard movement in the house would he have waited before breaching, to avoid having someone behind the door as he breached. (*Id.* at 54.)

There is a dispute over what the operational plan required next. In his written statement, Officer Ruscoe wrote that the plan called for the deployment of a single distraction device within the room before entering, which "was intended to distract the occupant(s) [sic] attention for a brief period to allow for safe entry of the team." (Ex. S to Def.'s 56(a)1 Stmt at 2.) Officer Sweeney testified that the plan called for him to enter the room before the flashbang detonated (*see* Sweeney Dep. at 249), and that he was told to immediately enter the house after the door was breached and to pin Terebesi (*id.* at 65, 238, 240.) Sweeney understood that the effect of a flashbang can last for between 6–8 seconds (*id.* at 173:1–5), and that "blast pressure from the Flashbang will create secondary ballistic projectiles" (*id.* at 179:4–21.) When the flashbang detonated, Sweeney testified that he thought he was taking fire. (*Id.* at 249.)

Officer Sweeney was assigned to be first in the entry "stack." Officer Ruscoe stated that Sweeney was assigned the "shield," "based on his performance in training and because he was a firearms instructor within his department." (Ruscoe Stmt at 3.) Sweeney testified that he was usually the rear guard on the entry team (Sweeney Dep. at 72), and did not know why he was selected to be the "shield" this time (*id.* at 70). Officer Weir was assigned to be second in the stack, and to carry a rifle into the residence. (Ruscoe Stmt at 3.) Officer Allen was assigned to be third and Officer Jones to be fourth, Ruscoe and Carillo, the two "team field leaders" for the SWERT team, were assigned to be fifth and sixth, respectively. (*Id.*)

Prior to the detonation of the third flashbang device, Sweeney, wearing full ballistic body armor, a Kevlar helmet and carrying a ballistic shield in his left hand and a Glock

10

semiautomatic pistol in his right hand, was the first to enter the residence. Officer Sweeney's orders were to enter the room and if he encountered Terebesi or any other occupants, to "pin" them to the ground with his shield. (Sweeney Dep. at 316.) Officer Sweeney testified that upon entering the family room, he took "three to four shuffle steps" and perceived "two adult men near the far right corner of the room." (*Id.* at 264–69.) Officers Edwards and Lee both testified that Lee threw the flashbang in before Sweeney entered. (Lee Dep. at 99.) Based on the DVD of the raid, the third flashbang was deployed at 11.59 seconds and detonated at 13.090, which is the time of Officer Sweeney's first shot. (*See* DVD, Ex. 47 to Pl.'s 56(a)2 Stmt.) Officer Lee testified that Sweeney was "inside the house" but "close to the doorway" when he fired his weapon. (Lee Dep. at 110.) Officer Sweeney testified that he saw the two men in a crouch position each with an arm outstretched and screaming. (Sweeney Dep. at 272–73.) Sweeney could not determine whether anything was in their hands, and he perceived the impacts to indicate that he was being fired at. (*Id.* at 287, 318.) Sweeney testified that Terebesi "pushed and pulled" on the shield in his left hand, and that he felt that his gun was being pulled downward and away. (*Id.* at 323.) Sweeney fired his weapon repeatedly until he regained control of it. (*Id.* at 331.)

It was determined that Guizan had been shot several times with Officer Sweeney's service weapon, causing his death. (Connecticut State Police Executive Summary Report, Ex. FF to Def.'s 56(a)1 Stmt at 6–7.) According to Defendants' forensics expert Dr. Palmbach, at the time of at least some of the discharges of Sweeney's weapon, Guizan's left hand was within a distance of that weapon "greater than contact but less than twelve inches." (Palmback Dep., Ex. GG to *id.* at 58.)

11

Plaintiffs dispute the entirety of Officer Sweeney's testimony with respect to his entry into Terebesi's residence, offering evidence to show that there was no time for any struggle. Officer Weir testified that he saw no struggle (Weir Dep. at 138), and there is no blood, DNA, or fingerprint evidence that Guizan's hands were on Sweeney's hands, gun, or person (*see* Palmbach Dep., Ex. 42 to Pl.'s 56(a)2 Stmt at 147, 198–99). Terebesi stated that he was "stunned, dazed, deafened and blinded by the blasts," but recalls that "an individual with a shield and a gun began firing shots in the direction of Guizan and me, and . . . I was feeling projectiles striking my body, which led me to believe that Guizan and I were both taking hits from bullets." (Terebesi Aff., Ex. 1 to Terebesi's 56(a)2 Stmt ¶ 46.)

II.    Discussion[1]

Defendants assert that they are entitled to summary judgment on all of Plaintiffs' claims, and that even if the Court were to find that issues of fact remained as to Plaintiffs' constitutional claims, Defendants are entitled to summary judgment based on a qualified immunity defense.

In *Cowan v. Breen*, the Second Circuit explained the process for evaluating claims of qualified immunity in excessive force cases using the analysis laid out by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) and preceding cases:

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

The threshold question is whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. The inquiry is whether the alleged use of excessive force was objectively reasonable. Thus, claims that an officer made a reasonable mistake of fact that justified the use of force are considered at this stage of the analysis. If the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover. If, however, a constitutional violation can be shown, the court must then determine whether the constitutional right was clearly established at the time of the constitutional violation. This inquiry focuses on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . This inquiry adds a 'further dimension' to the qualified immunity analysis by acknowledging that reasonable mistakes can be made as to the legal constraints on particular police conduct. . . . And it ensures that all but the plainly incompetent or those who knowingly violate the law are protected from suit.

*Cowan v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003) (citations omitted). Summary judgment on the basis of qualified immunity is not appropriate where material issues of fact exist as to both the underlying constitutional claim and the availability of the defense. *See Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) ("Though immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required.") (internal citations and quotation marks omitted).

    A.    Constitutional Claims

        1.    *Fourteenth Amendment (Guizan's Count Two Against All Defendants; Terebesi's Count Two Against Solomon, Candee, and Barton)*

Plaintiffs Complaints claim violations under both the Fourth (Count One) and the Fourteenth (Count Two) Amendments. However, Plaintiff Guizan addresses Count Two, but only "to the extent the Fourth Amendment does not apply to any of the alleged conduct of the planners, the Fourteenth Amendment, substantive due process, should apply" (Mem.

Opp'n at 38), and at oral argument Guizan's counsel clarified that it is Guizan's position that the Fourth Amendment should govern the Court's analysis as to the planning component of his claim.[2] Defendants assert that their actions in activating SWERT are not properly analyzed under the Fourth Amendment, must be considered under the Fourteenth Amendment, and that their conduct cannot meet the "shocks the conscience" standard set out in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

At oral argument, Defendants argued that there was "no guidance" from the Second Circuit as to whether the planning and deployment of a SWAT team implicated the Fourth Amendment, while also conceding that other circuits, as well as a court in this District, have determined that a fourth–amendment analysis is proper when considering the decision to deploy a SWAT team. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001) ("The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens. Indeed, it is the SWAT team's extraordinary and overwhelming show of force that makes "dynamic entry"•a viable law enforcement tactic in dealing with difficult and dangerous situations."); *Estate of Smith v. Marasco*, 318 F.3d 497 (3rd Cir. 2003) (analyzing decision to use a SWAT team to execute a warrant under the Fourth Amendment); *Warren v. Williams*, No. Civ. 3:04CV537 (JCH), 2006 WL 860998, at *27 (March 31, 2006) (same). Given the absence of case law to the contrary, the Court will consider Plaintiffs' claims, including those involving the decision to deploy a SWAT team, under a fourth–amendment analysis.

---

[2] Plaintiff Terebesi joins in this argument. (*See* Terebesi Opp'n at 1–2.)

2.      *Fourth Amendment (All Defendants)*

Plaintiffs Guizan and Terebesi both claim violations of the Fourth Amendment against all Defendants, and Defendants move for summary judgment as to these claims, arguing that their conduct did not violate the Fourth Amendment, and that even if it did, they are entitled to summary judgment on qualified immunity grounds.

a.      *Procurement of Search Warrant (Barton, Candee, and Solomon)*

Plaintiffs argue that Defendants Barton, Candee, and Solomon submitted materially false information about Chandra Pankov's credibility in order to obtain the search warrant. (*See* Guizan Am. Compl. [Doc. # 63] ¶ 42.) The Fourth Amendment provides that "no warrants shall issue, but upon probable cause." In evaluating a claim that material evidence has been omitted from a warrant application such that probable cause is lacking, a court "put[s] aside allegedly false material, suppl[ies] any omitted information and determine[s] whether the contents of the corrected affidavit would have supported a finding of probable cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993). If probable cause remains on the face of the corrected warrant, no constitutional violation of the plaintiff's fourth–amendment rights has occurred. *See id.*

At his deposition, Defendant Candee testified that he found Chandra Pankov's claims to be "amusing," and thought that it was "quite possible that she was not telling the truth." (Candee Dep. at 75–76.) Ms. Pankov was extremely thin, with an occasional twitch to her body, her teeth were decayed, and her eyes were glassy and dilated. (Barton Supp. Report, Ex. 11 to Pl.'s 56(a)2 Stmt.) She had a police record, including charges for interfering with an officer, resisting arrest, breach of peace, assault on an officer, threatening,

harassment, and evading responsibility, and she was on probation at the time of the raid. (Barton Dep. at 105–109.) In spite of her appearance and behavior, and in spite of Captain Candee's suspicion that she was being less than truthful, the warrant application stated that she was a "prudent and credible witness," and portrayed her to the judge as a citizen complainant. (Ex. 15, at EAST01564–1570.) There was no discussion with the prosecutor or the judge that a SWAT team would be used for the execution of the warrant.  (Candee Dep. at 168.)

"Probable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). Here, though Ms. Pankov may not have been the "prudent and credible" witness that Defendants claimed her to be, it appears that on the basis of her description of the home where the alleged drug use had occurred, Officer Barton knew it to be Terebesi's residence, even if she could not recall the street name or the house number. Further, the Defendants did not rely solely on Ms. Pankov in preparing the affidavits for the warrant application. Thus, Defendants Barton, Candee, and Solomon are entitled to summary judgment as to Plaintiffs' warrant claim.

b.   *Decision To Activate SWERT (Defendant Solomon)*

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations omitted). "The 'reasonableness' inquiry in an excessive force case is an objective

one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In conducting this reasonableness inquiry, a court must evaluate the specific facts of the case, "[i]ncluding the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Despite the "nature and quality of the intrusion" on Plaintiffs' Fourth Amendment rights at issue here, and the limited evidence to be seized, Chief Solomon testified that there was no balancing conducted by anyone of the value of the evidence to be seized as compared to the danger associated with the SWERT operation. (*See* Solomon Dep. at 570–71.) Here, rather than knocking on Mr. Terebesi's door to execute the search warrant, Defendants planned and conducted a dynamic entry with SWERT that included:

> 21 officers, wearing body armor, helmets, knee pads, and a ballistic shield; and carrying 21 handguns, one assault rifle, one machine gun, three sniper rifles, 1494 rounds of ammunition, 18 DefTech 25 explosive devices, a knife, two battering rams, a sledgehammer, a gaff and a haligan tool, among other things, in the raid.

(State Police Scene and Exhibit Report, Ex. 49 to Pl.'s 56(a)2 Stmt, at GUIZ01025– GUIZ01063.) In view of Chief Solomon's testimony that no balancing was conducted, the objective reasonableness of his actions remain in dispute, and he is not entitled to summary judgment based on his decision to deploy SWERT.

### c.    *Qualified Immunity*

Raising the doctrine of qualified immunity as a defense, Defendants contend that even if the decision to activate SWERT was unreasonable under the Fourth Amendment, the law is not clearly established, as "neither the Supreme Court nor the Second Circuit Court

of Appeals has ruled that calling out an emergency response team can be characterized as a use of force." (Defs' Mem. Supp. at 6.)

Contrary to Defendants' contention, it is not necessary that a Second Circuit or Supreme Court decision directly address an alleged constitutional violation in order for a right to be "clearly established." The Second Circuit has specified:

> To determine whether a right is clearly established, we look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law *a reasonable defendant would have understood that his or her acts were unlawful.*

*Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (emphasis added) (citing *Shechter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996)). The Supreme Court has held that "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id.* (citing *Anderson*, 483 U.S. at 640; *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Under *Saucier*'s analysis, for the purposes of deciding whether Defendants are entitled to qualified immunity as to their decision to activate SWERT, the threshold question is: taken in the light most favorable to the parties asserting the injury, do the facts alleged as to the decision to activate SWERT show the Defendants' conduct violated Plaintiffs' fourth–amendment rights to be free from unreasonable searches and seizures? 533 U.S. at 201 (2001). Even if there is no case directly on point, existing precedent governing claims

of excessive force, including the use of SWAT teams as a form of force, is sufficiently established so that the applicability of a fourth–amendment analysis to the decision to use a SWAT team is "beyond debate." *Ashcroft v. al–Kidd*, 131 S. Ct. at 2083.

In *Tennessee v. Garner*, the Supreme Court specified that "[b]ecause one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also *how it is carried out*." 471 U.S. 1, 8 (1985) (emphasis added). Thus, even if the Second Circuit has not explicitly addressed whether a fourth–amendment reasonableness analysis is appropriate in the context of a decision to use a SWAT team, the case law that has addressed the subject has applied *Garner*, which is "clearly established law." For example, the Tenth Circuit has held:

> Where a plaintiff claims that the use of a SWAT team to effect a seizure itself amounted to excessive force, we review the decision to use that degree of force by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."

*Holland*, 268 F.3d at 1190 (10th Cir. 2001) (sheriff, undersheriff, and leader of SWAT team's decision to use SWAT to make "dynamic entry" into private residence of person suspected of committing misdemeanor assault constituted conduct immediately connected with seizure of persons present at residence, and had to be examined to determine reasonableness of seizure under Fourth Amendment) (citing *Garner*, 471 U.S. at 8). Further, a court in this District followed "the approach of other courts that have confronted the question of whether the decision by law enforcement to use a SWAT team was itself excessive." *See Warren v. Williams*, 2006 WL 860998, at *27 (D. Conn. March 31, 2006) (citing *Holland*, 268 F.3d 1190; *Estate of Smith v. Marasco*, 318 F.3d at 517 (3d Cir. 2003) ("the Smiths have proffered

evidence sufficient to require that the question of the reasonableness of activating [SWAT] and of [SWAT] tactics be submitted to a jury.")).

Defendants themselves cite case law showing that the decision to use a SWAT team can implicate the Fourth Amendment, and that ascertaining whether or not a constitutional violation occurred requires a fact–specific reasonableness inquiry. *See, e.g.*, *Muehler v. Mena*, 544 U.S. 93, 99 (2004) ("The [SWAT] officers' use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion."); *see also id.* at 108 ("Considering [the *Graham*] factors, it is clear that the SWAT team's initial actions were reasonable. When officers undertake a dangerous assignment to execute a warrant to search property that is presumably occupied by violence–prone gang members, it may well be appropriate to use both overwhelming force and surprise in order to secure the premises as promptly as possible. In this case the decision to use a SWAT team of eight heavily armed officers and to execute the warrant at 7 a.m. gave the officers maximum protection against the anticipated risk.") (Stevens, J., concurring).

Having decided that a decision to deploy a SWAT team for dynamic entry into a residence is subject to a Fourth Amendment analysis, and because there remain factual disputes as to whether Defendant Solomon's actions were objectively reasonable under the Fourth Amendment when he activated SWERT, the issue of qualified immunity cannot be decided at this stage. *Kerman*, 374 F.3d at 109 ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, . . . if there is such a dispute, the factual questions must be resolved by the factfinder.") (internal citations omitted). Accordingly,

Defendant Solomon is not entitled to summary judgment on the basis of qualified immunity for his decision to activate SWERT.

> c.   *Operation Planning (Defendants Cirillo, Ruscoe, Jones, Kirby, and Solomon)*

As to Plaintiffs' claims that the development of the operation plan and the decision to use dynamic entry were unreasonable applications of force under the Fourth Amendment, Defendants argue that Plaintiffs cannot sustain these claims, because their behavior was objectively reasonable and because they are entitled to qualified immunity. Plaintiff Guizan contends that Defendants Candee, Kirby, Jones, Cirillo, and Ruscoe's conduct, "in ordering and directing the intentional seizure of Guizan through dynamic entry was unreasonable." (Guizan Opp'n at 23.)

Defendants rely primarily on the evidence supporting Terebesi's alleged drug activity and his gun possession. (Defs' Mem. Supp. at 8–10.) These facts, however, do not justify summary judgment. The evidence showing possible drug use in Terebesi's home, or evidence that Terebesi owned two guns, is countered in the record by evidence that Terebesi had no prior record (*see* Barton Dep. at 61), that the warrant only called for seizure of two crack pipes and personal use quantities of drugs, that the Easton officers who had previously interacted with him found him to be non–violent and cooperative with the police (*see id.* at 69), and that Chief Solomon knew that Terebesi had not previously been aggressive against any law enforcement officer at the time he and the SWERT team made the decision to execute the search warrant with a SWAT team and a dynamic entry (*see* Solomon Dep. at 118–19, 351, 355).

21

The record also shows that at least two members of SWERT openly disagreed with the team members who developed the raid plan, and that the team rejected their proposed alternatives to the dynamic entry plan. Lawlor told Cirillo that the dynamic entry was too dangerous—both to the officers and to the occupants of the house—for a drug warrant, and Redgate indicated it was not worth the danger to the officers for drug evidence. (*See* Lawlor Dep. at 32–33, 35–36; Redgate Dep. at 32–33, 35. Redgate testified that two to three other SWERT officers proposed alternate raid plans at the team meeting, but that these proposals were similarly ignored. (*See* Redgate Dep. at 61, 65–66.)

Taken as a whole, the factual record does not support a grant of summary judgment in Defendants' favor as to the fourth–amendment claims pertaining to the planning, as a reasonable jury could conclude that Defendants' conduct in directing the execution of a raid of this nature, which carried substantial risk to officers and to the Plaintiffs, when balanced against the private interests at stake, and the severity of the crime at issue (i.e., small quantities of crack cocaine and crack pipes), was objectively unreasonable.

### d.   Qualified Immunity

For the reasons discussed in the previous section, summary judgment on the basis of qualified immunity is similarly inappropriate as to the planners of the raid. Since use of dynamic entry and distraction devices implicates the Fourth Amendment reasonable force requirement, resolution of the question of whether it was objectively reasonable for the planning Defendants to develop this particular plan requires jury determination of the competing evidence, including weighing the testimony of at least two SWERT members who disagreed with the use of dynamic entry. *See Kerman v. City of New York* ("*Kerman II*"), 261 F.3d 229, 241 (2d Cir. 2001) ("Once the outstanding factual questions are answered, there

will remain for decision in the district court the issues of whether officer Crossan violated the Fourth Amendment and, if so, whether he is nevertheless entitled to qualified immunity.").

> d.      *Execution of Search Warrant (Phillipson, Brennan, Torreso, Edwards, Lee, Sweeney, and Weir)*

Defendants argue that because "reasonableness is determined based on the information possessed by the officer at the moment that force is employed," they are entitled to judgment as a matter of law with respect to all of Plaintiffs' excessive force claims pertaining to the execution of warrant at Plaintiff Terebesi's home. (Defs' Mem. Supp. at 16 (citing *Waller v. City of Danville*, 212 Fed. App'x 162, 171 (4th Cir. 2006)).) However, there remain significant factual disputes over what information the SWERT members possessed during the relevant seconds of the execution of the search warrant such that summary judgment is not justified here.

> i.      Knock and Announce

First, Plaintiffs argue that Defendants violated the knock and announce rule—in and of itself a fourth–amendment violation—in the execution of the operation plan itself, through the conduct of the "Rake and Break" team and the "Front Entry" team during the raid.

"The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application." *Miller v. United States*, 357 U.S. 301, 313 (1958). The knock and announce rule serves several purposes:

> One of those interests is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self–defense by the surprised resident. Another interest is the protection of property. Breaking a house (as the old cases typically put it) absent an announcement would penalize someone who did not know of the process, of which, if he had notice, it is to be presumed that he would obey it. The knock–and–announce rule gives individuals the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry. And thirdly, the knock–and–announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the opportunity to prepare themselves for the entry of the police. The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed. In other words, it assures the opportunity to collect oneself before answering the door.

*Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (citations omitted).

Regarding the Rake and Break team, Plaintiffs argue that Defendants Torreso, Brennan, and Phillipson violated the knock–and–announce rule when they broke a window and threw flashbangs into the dining room, all prior to announcing and then giving "conflicting" information that confused and disoriented Guizan. Even if, as Defendants contend, the deployment of the "rear distraction devices" did not cause any physical injury, there are facts in dispute as to whether Torreso, Brennan, and Phillipson acted unreasonably when they broke the window, deployed two flashbangs, and yelled "Police. Police with a warrant. Hands up."

"A knock and announcement must be loud enough to be heard, and it must be followed by a pause long enough for someone to answer or come to the door." *United States v. Leichtnam*, 948 F.2d 370, 374 (7th Cir. 1991). Here, the record shows that the announcement was given either *simultaneously or after* the deployment of flashbangs, and thus, the purpose of the knock–and–announce rule was frustrated. Further, the Rake and

Break team's instructions of "Hands up," were unclear and confusing when considered in the context of the entire raid, as such an instruction did not communicate to the Plaintiffs where the police were (e.g., in the window of an adjacent room, or at the front door). Thus, the Rake and Break Defendants are not entitled to summary judgment.

As to the Front Entry team's alleged knock–and–announce violations, Defendants argue that "the only potential issue as to the entry by the team is whether or not the officers waited a sufficient amount of time before forcing entry," and cite the exigent circumstances rule as justifying any potential violation. (Defs' Mem. Supp. at 23.) In discussing the application of the exigent circumstances rule, the Supreme Court has held that:

> [A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. Moreover, although no exigency is created simply because there is probable cause to believe that a serious crime has been committed, application of the exigent–circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed.

*Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) ("The petitioner was arrested in the privacy of his own bedroom for a noncriminal, traffic offense. The State attempts to justify the arrest by relying on the hot–pursuit doctrine, on the threat to public safety, and on the need to preserve evidence of the petitioner's blood–alcohol level. On the facts of this case, however, the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime."). The Second Circuit has further indicated that there are "six touchstones" for determining the existence of exigent circumstances:

(1) the gravity or violent nature of the offense with which the suspect is to be charged;  (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995) (also noting that federal courts have considered whether "quick action is necessary to prevent the destruction of evidence.").

Here, the only potential "touchstone" relied on by Defendants appearing to support the existence of exigent circumstances is whether or not Terebesi was "reasonably believed to be armed." However, given the dispute as to whether such a belief would have been reasonable, in light of Officer Barton's knowledge that Terebesi kept his Beretta in a collectors' case at his parents house, and never tried to conceal his ownership of the other gun, (neither of which Defendants argue that he possessed illegally),[3] such a reasonableness inquiry is properly left for jury determination.

ii.     Use of Flashbangs

Plaintiffs also argue that the execution of the plan used flashbangs in an unreasonable manner, constituting an excessive use of force. Defendants make a qualified immunity argument and assert that because the law regarding the use of flashbangs is not "clearly established," they are entitled to summary judgment. Such specific precedent on the

---

[3] At least two circuits have held that the presence of a gun alone does not justify exigent circumstances.  *United States v. Nielson*, 415 F.3d 1195 (10th Cir. 2005) (no knock not justified for possession, even though gun present); *Gould v. Davis*, 165 F.3d 265, 272 (4th Cir. 1998) (no reasonable officer could believe a legally–possessed firearm justifies a no–knock warrant execution).

26

application of the Fourth Amendment is not necessary where clear principles exist which are easily applied to the device's known characteristics, as noted in a 2006 case from this District:

> Because the device was capable of inflicting serious bodily injury, defendants had fair notice that they could only use the flash–bang device when reasonable and that they needed to exercise caution when actually using the device. The fact that binding precedent from the U.S. Supreme Court or the Court of Appeals for the Second Circuit does not exist on this point is of no moment; general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.

*Taylor v. City of Middletown*, 436 F. Supp. 2d 377, 387 (D. Conn. 2006).

As devices "capable of inflicting serious bodily injury," the use of these devices is subject to the same Fourth Amendment reasonableness analysis as other applications of force by police officers. *Graham v. Connor*, 490 U.S. at 395 (holding that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). The reasonableness of the use of flashbang devices within the context of the overall dynamic entry remains in dispute.[4] Accordingly,

---

[4] In *Taylor*, the court distinguished between the situation of "a calculated, preemptive display of force without actually causing physical harm to the plaintiff," which might not implicate the Fourth Amendment, from the facts at issue in *Taylor*, which were similar to those at issue here: where "[d]efendants did not employ force as a reaction to plaintiffs' conduct; indeed, . . . plaintiffs . . . posed no actual or potential threat to defendants—[plaintiffs] simply were sitting on a couch when the officers entered." 436 F. Supp. 2d at 383, 387 ("The court cannot conceive of a set of circumstances that would permit an officer, contrary to the intended use of the device, to throw a flash–bang device directly at a person. In any event, such circumstances certainly do not exist in this case, where plaintiffs were unarmed bystanders sitting on a couch.").

Defendants' motions for summary judgment as to the reasonableness of their use of flashbangs will be denied.

### iii.   Excessive Force as to Officers Sweeney and Weir

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Defendants maintain that Officers Sweeney and Weir's conduct was objectively reasonable, and that Sweeney was required to make a split–second decision, "in light of the facts and circumstances confronting [him]," of the type contemplated in *Graham*. (Defs' Mem. Supp. at 18 (citing *Nimely v. City of New York*, 414 F.3d 381, 390 (2d Cir. 2005).)

The Court disagrees. Even a "split second decision" is subject to a reasonableness standard. Sweeney's decision to enter the residence right before the third flashbang detonated, the credibility of his recollection, his ability to see after being hit with flashbang debris, and the very short amount of time that Sweeney was in the room prior to discharging his weapon multiple times contribute to the miasma of disputed circumstances under which deadly force was used, and a grant of summary judgment for Defendant Sweeney is not warranted.

Officer Weir fired one shot into the ground, testifying that he heard multiple gunshots before he fired, and mistook the flashes from Sweeney's gunshots to be gunfire from Guizan. (Weir Dep., Ex. 16 to Pl.'s 56(a)2 Stmt at 111–12.) Weir testified that he did not see any need to shoot further (*id.* at 109), though Sweeney continued to discharge his weapon three more times. Defendants' forensic expert has provided evidence that Weir's

bullet hitting the floor may have caused some of the injuries to Guizan's face. (*See* Palmbach Report, Ex. HH to Def.'s 56(a)1 Stmt ¶ 11.) Thus, Officer Weir's use of his weapon causing injury to Guizan in Terebesi's home is subject to the same reasonableness inquiry from *Graham*, and should be left for jury determination.

       iv.  Qualified Immunity as to the Plan's Execution

    Each individual Defendant argues that he is entitled to summary judgment on the basis of qualified immunity. As discussed with respect to each segment of SWERT's execution of this plan, there are facts in dispute as to the Rake and Break team's and the Front Entry team's actions with respect to the knock and announce rule, their use of flashbangs, and the actions of Officers Sweeney and Weir when they entered the house. Taking the record in the light most favorable to Plaintiffs, a reasonable jury could conclude that the execution of the raid gave rise to violations of the knock and announce rule, and unreasonable and excessive applications of force in violation of the Constitution. Since there is no question that the law of "knock and announce" is clearly established, as is the law on excessive force, which necessarily applies to the use of flashbangs, shields used to "pin" people, and guns when employed as various forms of force. Thus, the individual SWERT members, Phillipson, Brennan, Torreso, Edwards, Lee, Sweeney, and Weir are not entitled to summary judgment on the plan's execution based on qualified immunity.

      f.  *Failure To Intervene (Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torreso, Edwards, Lee, Sweeney and Weir)*

    Defendants also move for summary judgment as to Plaintiff Guizan's claim of failure to intervene. Liability for use of excessive force extends not only to those officers who

29

physically apply the force, but also to those who unreasonably stand by and fail to intervene to stop the use of excessive force by a fellow officer: "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988) (defendant officer "can be found liable for deliberating choosing not to make a reasonable attempt to stop" the use of excessive force by another officer with respect to abuse that he had a "realistic opportunity" to stop).

Defendants focus on the limited amount of time the other SWERT members had to intervene once Officers Sweeney and Weir entered the residence (*see* Defs' Mem. Supp. at 34–35), to which Plaintiff Guizan counters that "*every* defendant had the opportunity to intervene . . . after the plan was disclosed to them in briefing." (Guizan Opp'n at 40 (emphasis added)). In the context of a SWAT raid, the Ninth Circuit has concluded that where every officer "was aware of the decision to use the flashbang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed" all were subject to liability. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).

"In evaluating a claim of failure to intervene, the court must look separately at different episodes of force that may, together, make up the plaintiff's claim." *Jones v. City of Hartford*, 285 F. Supp. 2d 174, 182 (D. Conn. 2003) (citing *O'Neill*, 839 F.2d at 11). Here, the record shows that each SWERT member, along with Solomon, Candee, and Barton, was fully briefed on the plan, had ample opportunity to object (as Lawlor and Redgate did), and did not. Thus, even without considering the "split seconds" involved in the actual firearms used, the question of whether Defendants "had a realistic opportunity to intervene to prevent the harm from occurring" from the initial and final uses of force, *id.* (citing *Anderson v. Branen*,

17 F.3d 552, 557 (2d Cir.1994)), starting from the point of briefing of the operation's planned uses of force, is a question of fact for the jury.

g.      *Municipal Liability (All Towns and All Police Chief Board Defendants)*

Defendants assert that Plaintiffs have not provided a single piece of evidence in support of their claims of municipal liability under § 1983. In opposition, Plaintiffs argue that there are four separate ways in which all of the Town Defendants and BPC Defendants may be liable under § 1983: (1) unconstitutional policies and procedures as described in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–23 (1988), (2) inadequate training and supervision amounting to deliberate indifference to the rights of persons with whom the police come into contact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989), and (3) ratification by BPC and the Town of Monroe of the unconstitutional killing of Guizan. For the reasons that follow, the Court concludes that there are sufficient facts in dispute as to the roles of the Town Defendants that they are not entitled to summary judgment on Plaintiffs' municipal liability and failure to train claims, however, the individual police chiefs—Lovello, Kiely, Kulhawik, and Salvatore—whose involvement was limited to answering Solomon's request for SWERT activation, are entitled to summary judgment on the failure to train and supervise claims against them.

i.      Unconstitutional Policies and Procedures

Plaintiffs argue that SWERT was trained to enter before the flashbangs detonated, and that "Sweeney, consistent with training, rushed in and the flashbang detonated in his immediate proximity, causing him to shoot and kill Gonzalo Guizan." (Pl.'s Opp'n at 55.) At his deposition, Defendants' expert Urey Patrick testified that "[o]perators can and are

31

occasionally in the same room when a flashbang goes off for a variety of reasons. But *they don't train that way.*" (Urey Dep., Ex. 19 to Pl.'s 56(a)2 Stmt at 109:18–20 (emphasis added).) When asked: "When you observed it in training, those officers that entered before the Flashbang detonated, were they corrected and told that that was not a good idea to do that?" (*id.* at 109:21–24), Urey responded, "Well, yeah. They were . . . told 'wait until you hear the bang'" (*id.* 109:25–110:1). However, Guizan points to deposition testimony of several Defendants that suggests that SWERT, in contravention of this policy, had trained its operators that it is permissible when using flashbangs to enter *before* the flashbang detonates. Officer Ruscoe testified that during training, officers were not instructed to wait before entering a room in which a flashbang was about to go off. (Ruscoe Dep., Ex. 27 to Pl.'s 56(a)2 Stmt at 241.) He further clarified, "I wouldn't tell someone it was not appropriate . . . because if he did it and had a reason to do it, that's fine. If it's like you said, an accident or mistake, then he would have been corrected by someone." (*Id.* at 242:25–243:6.) Detective Edwards testified that if there is "a need for [a police officer] to be in there before it actually detonates, depending on the proximity of where the Flashbang is thrown, he could enter." (Edwards Dep., Ex. 30 to Pl.'s 56(a)2 Stmt at 78:20–23.) Though the record suggests that there may have been inconsistencies within the training on flashbangs, Plaintiff Guizan does not show how, on its own, this training inconsistency would amount to an unconstitutional policy or procedure in violation of the Fourth Amendment. Further, a particular "nuance" of training "may only become apparent to municipal policymakers after a pattern of violations arises in substantially similar circumstances. *Cash v. County of Erie*, 654 F.3d 324, 336 (2d Cir. 2011). Thus, on its own, the flashbang training described in the record is insufficient to support a claim of municipal liability.

Next, Guizan argues that training an officer to "pin" with a shield on a dynamic entry, regardless of circumstances, amounts to an unconstitutional procedure in violation of the Fourth Amendment. At his deposition, Officer Sweeney testified that as the person assigned to be the "shield," he was "to provide security coming through the door. If someone encounters you, you are going to pin that person with the shield." (Sweeney Dep., Ex. 26 to Pl.'s 56(a)2 Stmt at 66:21–23.) When asked if "there are no other particular objectives [as a shield] other than to pin the person" (*id.* at 68:3–5), Officer Sweeney also stated, "my objective would be to secure the person with the shield until . . . a member from the arrest team comes up and secures that person" (*id.* at 68:10–13). Sergeant Torreso also testified, that while he did not "specifically recall [Officer Sweeney] being told to do so," being told to pin with a shield was a "common practice." (Torreso Dep., Ex. 32 to Pl.'s 56(a)2 Stmt at 89:18–24.) While it appears that the record could support Guizan's contention that SWERT members were trained to use pinning with a shield as a "common practice," Plaintiffs have not shown how pinning with a shield would in and of itself rise to the level of an unconstitutional use of force, and thus, no reasonable juror could find, on the basis of shield–pinning alone, the BPC or the Town Defendants were liable for implementing unconstitutional policies and procedures.

Plaintiffs also assert that the BPC and the Town Defendants should be held liable under § 1983 under a failure to train theory. "The inadequacy of police training can form the basis for 42 U.S.C. § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Deliberate indifference" is a "stringent standard of fault," *see Connick v. Thompson*, 131 S. Ct. 1350 at 1360 (2011), and "necessarily depends on

a careful assessment of the facts at issue in a particular case." *Cash*, 654 F. 3d at 334. In the context of failure to train police officers, deliberate indifference is explained as:

> [I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.

Though a pattern of similar constitutional violations is usually required in order to prove liability under a failure to train theory, in *City of Canton*, the Supreme Court provided an example of what could constitute an unconstitutional failure to train under a "single incident" theory of liability:

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.*

Here, there is sufficient factual support in the record to withstand Defendants' summary judgment motion against the Towns, as the operators of SWERT. Focusing on the adequacy of the training program in relation to dynamic entries that SWERT members must perform, Plaintiffs have put forward evidence to show that at the time of the raid, there were

34

only "draft" policy and procedure manuals, of which at least two members of SWERT testified that they had no knowledge. (*See* Lawlor Dep., Ex. 9 at 87; Lee Dep., Ex. 31 at 38:6–14.) Further, neither draft policy and procedure manual was signed by the BPC; Chief Lovello testified that at the time of the raid, "the only guidelines that had been approved were the 2004 guidelines . . . but [the draft] had not been voted on by the chiefs." (Lovello Dep., Ex. 40 at 24:20–23), and Lieutenant Kirby testified that "we were told by the chiefs to use [the 2004 draft] as a guideline. They never officially accepted it" (Kirby Dep., Ex. 24 at 27:15–17). However, Kirby testified that at the time of the raid, the "standard operating procedure" was the 2008 draft guidelines, *not* the guidelines from 2004. (*Id.* at 29:12–19.) Further, there were no requirements that SWERT members rehearse preplanned operations, there was no protocol for high risk warrant service, no policy for the use of flashbangs distributed to SWERT members, and no SWERT training on the use of deadly force at the time of the raid. (Lovello Dep. at 60.)

Consistent with its own statement of purpose, that SWERT "is formed for the purpose of providing for the rapid . . . deployment of specially trained law enforcement personnel and resources to any incident involving tactical operations, . . . or any situation requiring immediate augmentation of local law enforcement personnel to preserve life and protect property" (Ex. A to Def.'s 56(a)1 Stmt), a reasonable jury could conclude that the need to train SWERT officers in the constitutional limitations on the use of force associated with dynamic entry was "so obvious" that "failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 471 U.S. at 390 n.10. Thus, the Town Defendants are not entitled to summary judgment on Plaintiffs' municipal liability claims.

ii.      Individual Police Chief Liability

As to individual police chiefs Lovello, Kiely, Solomon, Kulhawik, and Salvatore, and Defendants Kirby, Jones, Ruscoe, and Cirillo, Plaintiffs argue that they, in their individual capacities, failed to adequately train and supervise SWERT prior to the raid. (*See* Guizan's Opp'n at 62.) The personal involvement of a supervisory official may be shown by evidence that:

> (1) the [official] participated directly in the alleged constitutional violation, (2) the  [official] after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the  [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the  [official] was grossly negligent in supervising subordinates who committed the wrongful acts.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Direct participation is not necessary to establish personal involvement under § 1983, *Al-Jundi v. Estate of Nelson Rockefeller*, 885 F.2d 1060, 1066 (2d Cir. 1989), though there must be "a showing of some personal responsibility." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

It is undisputed that none of the Police Chief Defendants except Solomon actually participated in the planning or the implementation of the May 18, 2008 operation. The record suggests that there may have been areas of training that were lacking for the SWERT members, but this, too, is insufficient for supervisory liability, unless Plaintiffs can show that the members of the BPC were grossly negligent in supervising their subordinates. Even viewing the record in the light most favorable to Plaintiffs, there are insufficient facts that would allow a reasonable juror to find that any individual member of the Board of Police Chiefs, except for Chief Solomon, who organized and planned the raid, was personally grossly negligent, or personally created a policy or custom under which the alleged violations

36

occurred. Thus, Defendant Police Chiefs Lovello, Kiely, Kulhawik, and Salvatore are entitled to summary judgment on Plaintiffs' claims of supervisory liability in their individual capacities.

However, as to Chief Solomon, and Defendants Kirby, Jones, Ruscoe, and Cirillo individually, numerous facts remain in dispute as to the specific preparation given to SWERT team members the day of the raid, including implementing this plan in the absence of standard operating procedures and training on the use of deadly force. The objective reasonableness of such claims requires a factual determination by the jury, and thus, these Defendants are not entitled to a qualified immunity defense on Plaintiffs' failure to train and failure to supervise claims.

### iii.    Ratification

Plaintiffs also contend that BPC and the Town of Monroe "ratified" the unconstitutional killing of Guizan, as SWERT has not conducted an after–action report, nor has BPC reviewed the operation. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Guizan points out that after the raid, BPC did not review the operation though in the past police chiefs would receive "after–action reports" from the team (*see* Lovello Dep., Ex. 40 to Pl.'s 56(a)2 Stmt at 49), and that Officer Sweeney was named "Officer of the Year" by the Town of Monroe based on his actions during the raid (Sweeney Dep., Ex. 26 at 17–18). These facts are sufficient to support Plaintiffs' ratification argument as to the Town Defendants. *See Praprotnik*, 485 U.S. at 127 (" [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the

official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). However, there is no evidence in the record to support Plaintiff's argument that the individual Police Chiefs "ratified" Officer Sweeney's conduct, or the operation itself.

      B.     State Law Claims

            1.     *Assault and Battery (Guizan Against Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir)*

Defendants have moved for summary judgment on Guizan's assault and battery claims (Counts Three and Four). To prevail on a claim for assault and battery, a plaintiff must establish that a defendant applied force or violence to him and that the application of such force or violence was unlawful. *Moriarty v. Lippe*, 162 Conn. 371, 389 (Conn. 1972). As discussed above, there are sufficient material facts in dispute as to preclude summary judgment for Defendants as to the application of unlawful force on Guizan's person on the part of the Defendant SWERT members (i.e., Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir) to preclude a finding of summary judgment on their behalf.

Plaintiff Guizan also maintains that the Defendants who did not personally "apply force or violence" to him—that is, Defendants Solomon, Barton, Kirby,  and Candee—are

still liable as joint tortfeasors acting in concert. Restatement (Second) of Torts, § 876, Persons Acting in Concert, provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The rules regarding joint tortfeasors are applicable "to all torts, including not only negligence but also . . . any other basis of tort liability." *Gionfriddo v. Gartenhaus Cafe*, 15 Conn. App. 392, 398 (Conn. App. Ct. 1988).

By means of illustration of persons acting in concert, the Restatement of Torts uses the example of "A, a policeman, advises other policemen to use illegal methods of coercion upon B. A is subject to liability to B for batteries committed in accordance with the advice." *See* Restatement (Second) of Torts § 876 (1979). Thus, under this rule, there appears to be sufficient evidence in the record that a jury could find that Defendants Kirby, Barton, Candee and Solomon "gave substantial assistance" to the tortfeasors "in accomplishing a tortious result." *Gionfriddo*, 15 Conn. App. at 398. In fact, the plan itself called for Officer Sweeney to "pin" the occupants with a shield (*see* Sweeney Dep. at 70), and Officer Sweeney testified that "my objecti[ve] was, as soon as the door is breached and I enter, if I encounter Mr. Terebesi, to pin him (*see id.* at 65). This instruction in and of itself could be sufficient to establish that the raid "planners"—Solomon, Candee, Kirby, Barton, Jones, Ruscoe, and Cirillo—knew that Sweeney's conduct constituted a breach of duty, or gave "substantial assistance" to the commission of an unlawful and harmful touching. As to Phillipson,

39

Brennan, Torreso, Edwards, Sweeney, and Weir, a reasonable juror could find that either they, in executing the raid, unlawfully applied force to Plaintiff, or that they committed "a tortious act in concert" with others. Accordingly, Defendants are not entitled to summary judgment on Guizan's assault and battery claims.

2.    *Aiding and Abetting (Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir)*

The Connecticut Supreme Court has set forth the elements required to prove a cause of action for aiding and abetting: (1) the party whom the defendant aids must perform a wrongful act causing injury, (2) the defendant must be generally aware of her role as part of an overall illegal or tortious activity at the time she provides the assistance and (3) the defendant must knowingly and substantially assist the principal violation. *Efthimiou v. Smith*, 268 Conn. 499, 505 (Conn. 2004) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

As discussed above, there remain facts in dispute as to whether the SWERT members committed unlawful tortious activity against Plaintiffs. Further, when viewed in the light most favorable to Plaintiffs, there are sufficient facts to support Plaintiffs' argument that Defendants knowingly and substantially assisted in the raid, leading to the wrongful acts that caused Plaintiffs' injuries.

3.      *Intentional Infliction of Emotional Distress (Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir)*

In order to prove that a defendant is liable under an IIED claim, a plaintiff must show: (1) that defendants intended to inflict emotional distress or knew or should have known that their conduct would likely result in emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct in question was the cause of plaintiff's distress; and (4) that the emotional distress experienced by plaintiff was severe.  *Appleton v. Bd of Educ. of Town of Southington*, 254 Conn. 205, 210 (Conn. 2000).

Viewed in the light most favorable to Plaintiffs, the record provides sufficient evidentiary support for Guizan's and Terebesi's claims for the intentional infliction of emotional distress. Here, even if Defendants did not intend to inflict emotional distress, all that is required in Connecticut is that the defendant "knew or should have known that emotional distress was the likely result of his conduct," and the record supports such a finding by a reasonable factfinder under that element. This is not a case in which the conduct is " merely insulting or displays bad manners or results in hurt feelings," *see id.* at 211, and here, reasonable minds could disagree as to whether Defendants' conduct in executing the search warrant of Terebesi's residence to seize personal use quantities of crack cocaine with SWERT magnitude strength was extreme and outrageous. As such, this is an issue for the jury. *Id.* at 210 (citing *Bell v. Bd of Educ.*, 55 Conn. App. 400, 410  (Conn. 1999)) ("Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury.").

4.       *Negligence (Against All Defendants: Guizan, Count Five; Terebesi,*
         *Count Four)*

Defendants argue that Plaintiffs' negligence claims are barred under the doctrine of governmental immunity, because it is settled under Connecticut law that "the general deployment of police officers is a discretionary governmental action as a matter of law." *Wilson v. City of Norwich*, 507 F. Supp. 2d 199, 211 (D. Conn. 2007).

"Under Connecticut law, a municipal employee . . . has a qualified immunity in the performance of a governmental duty, but he may be liable if he misperforms a ministerial act, as opposed to a discretionary act." *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 166 (1988) "Municipalities are similarly immune from liability for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." *id.; see also* Conn. Gen. Stat. § 52-557n.

Plaintiffs assert that their negligence claims fall within two of the three exceptions to this governmental immunity doctrine: (1) where the circumstances make it apparent to the municipal officer that his failure to act would be likely to subject an identifiable person to imminent harm; . . . and (3) where the alleged acts involve malice, wantonness, or intent to injure, rather than negligence. *See Evon v. Andrews*, 211 Conn. 501, 505 (Conn. 1989). Plaintiffs argue that the first and third exceptions apply to this case.

As an initial matter, the Court does not find that a reasonable juror could conclude the individual police chief Defendants—Kiely, Salvatore, Lovello, and Kulhawik—were liable under either exception to the governmental immunity doctrine. The record is undisputed that those chiefs did nothing but agree to convene the SWERT, upon Chief Solomon's

request, and thus, they are entitled to summary judgment on Plaintiffs' negligence claims against them. However, as to the remaining Defendants, under the first exception, a plaintiff must demonstrate: " (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Doe v. Petersen*, 279 Conn. 607, 616 (2006). A court must determine whether the evidence presented is sufficient to establish that it was apparent to Defendants that their failure to provide adequate training, and their implementation of the operation plan would be likely to subject Plaintiffs to imminent harm. *See, e.g., Burns v. Bd. of Educ. of City of Stamford*, 228 Conn. 640, 650 (1994) (the plaintiff schoolchild who slipped and fell due to icy conditions on a main accessway of the school campus, during school hours, "was one of a class of foreseeable victims to whom the superintendent owed a duty of protection in relation to the maintenance and safety of the school grounds, and accordingly governmental immunity is no defense"). Here, there are sufficient facts present in the record to support Plaintiffs' contention: Defendants knew that there were two people inside the house (*see* DVD), and were aware of the risks associated with dynamic entry and flashbangs.

As to the third exception—that the alleged acts involved malice, wantonness, or intent to injure—a plaintiff must prove "the existence of a state of consciousness with reference to the consequences of one's acts. Such conduct is more than negligence, more than gross negligence. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others." *Elliott v. City of Waterbury*, 245 Conn. 385, 414 (1998). There are issues of fact in dispute as to whether all Defendants acted in "reckless disregard" of Plaintiffs' safety. Thus, as a reasonable juror could find that at least one of the two exceptions is met, Defendants are not entitled to summary judgment on the basis of governmental immunity.

43

     5.      *Recklessness (Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo,*

*Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir)*

In order to establish that the defendants' conduct was reckless, a plaintiff must prove, on the part of the defendants:

> the existence of a state of consciousness with reference to the consequences of one's acts . . . . [Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.

*Shay v. Rossi*, 253 Conn. 134, 181–82 (Conn. 2000) *overruled in part on other grounds*, *Miller v. Egan*, 265 Conn. 301 (2003).

As discussed above, the record is undisputed that the individual Police Chief Defendants (with the exception of Chief Solomon) only agreed to Solomon's request to convene SWERT, and based on the information that they were given, no reasonable juror could conclude that such conduct was "highly unreasonable." However, as to the remaining Defendants, the record shows that the SWERT raid was precisely a situation where "a high degree of danger was apparent," and, viewed in the light most favorable to Plaintiffs, Defendants' conduct in planning and implementing the execution of this search warrant under the circumstances could be found "highly unreasonable."

III.    Conclusion

For the reasons discussed above, Defendants' motions [Doc. ## 199, 200]  for summary judgment are GRANTED in part and DENIED in part. Individual police chiefs Kiely, Salvatore, Lovello, and Kulhawik are dismissed from the case.

The following claims remain for adjudication against the following Defendants:

1.    Fourth–amendment claims
    a.    Excessive force: Solomon, Candee, Barton, Kirby, Ruscoe, Jones, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir
    b.    Failure to intervene: Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir

2.    Municipal liability under 42 U.S.C. § 1983: Defendants Towns of Monroe, Easton, Wilton, Darien, and Trumbull

3.    Supervisory liability under 42 U.S.C. § 1983: Solomon, Kirby, Jones, Ruscoe, and Cirillo

4.    State law claims:
    a.    Assault and battery: Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir
    b.    Aiding and abetting: Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir
    c.    IIED: Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir
    d.    Negligence: Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir

e.      Recklessness: Solomon, Barton, Candee, Kirby, Jones, Ruscoe, Cirillo, Phillipson, Brennan, Torresso, Edwards, Lee, Sweeney, and Weir

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of August, 2012.